## ARCOLA SUGAR MILLS CO. v. FARMER HAMLETT'S CO.

(Court of Civil Appeals of Texas. Galveston. Feb. 12, 1920. Rehearing Denied March 11, 1920.)

1. Sales ⊂⟳71(4)—Contract obliging seller to deliver only syrup manufactured during year.

Contract for sale of syrup by sugar mills company *held* to have been only to deliver to buyer syrup manufactured by it at its mills in a particular city during grinding season of 1916; statement of amount of syrup in contract having been intended to be only an estimate.

2. Evidence ⊂⟳448—Parol evidence inadmissible to vary unambiguous written contract of sale.

Where there is no doubt or ambiguity in the language, no matter what may have been intention of parties to contract of sale, in absence of allegations of fraud or mistake, no evidence can be considered which changes obligations expressed in writing.

3. Evidence ⊂⟳450(8)—Contract of sale held not ambiguous so as to justify admission of parol evidence.

A contract for the sale of syrup *held* to contain no doubt or ambiguity in its language justifying the admission of parol explanatory evidence.

Appeal from District Court, Harris County; Charles E. Ashe, Judge.

Suit by Farmer Hamlett's Company against the Arcola Sugar Mills Company. From judgment for plaintiff, defendant appeals. Reversed and rendered.

Woters, Storey, Blanchard & Battaill, of Houston, for appellant.

Baker, Botts, Parker & Garwood, of Houston, for appellee.

PLEASANTS, C. J. This suit was brought by appellee against the appellant to recover damages for the alleged breach by appellant of a contract for the sale to appellee of 100,-000 gallons of syrup. The petition alleges that the contract for the sale of the syrup was partly written and partly oral. The written contract was attached to the petition as an exhibit. The only portion of this contract which is material in the determination of the controlling issue in this suit is that showing the quantity of syrup contracted to be sold. This paragraph is as follows:

"That for and in consideration of the mutual promises and agreements hereinafter set forth, the seller agrees to manufacture, sell, and deliver in the manner hereinafter provided, and the buyer agrees to purchase, during the cane-grinding season of 1916, all of the syrup manufactured by the seller at its mill at House, Tex., in Fort Bend county, estimated to be about 100,000 gallons, more or less, of pure Texas ribbon cane syrup, made from perfectly sound and properly cleaned cane, and to be finished in open evaporators, and satisfactory to the buyer, and to run 38½ Beaume at 90 deg. Fahrenheit, except what syrup the seller may use in its commissary at House, Tex., not exceeding 25 barrels. Relative to the number of gallons to be manufactured, it is understood that the seller shall notify the buyer of the approximate number of gallons of syrup to be produced and manufactured, if more than 100,000 gallons is made, on or before December 1, 1916."

It is alleged that in addition to the written contract defendant represented and assured plaintiffs that it would manufacture at its said mill during the cane-grinding season of 1916 at least 100,000 gallons of syrup, and in all probability 150,000 gallons; that at the time and prior to the making of the contract plaintiffs had had no opportunity to investigate, and had in fact not investigated, the condition of defendant's cane crop, and were not in any position to ascertain how much syrup defendant would make, except by the statements and representations that defendant made to them; that the contract was made at a time when defendant could have estimated with reasonable accuracy the amount of syrup it would manufacture; and that the means of knowing the condition and amount of the cane crop were wholly and solely within the knowledge of defendant, and the plaintiffs relied upon the representations and statements made by defendant to them as to the amount of syrup to be manufactured.

It is also alleged, in substance, that the statements and representations made by defendant as to the amount of syrup it would manufacture were wildly and recklessly made, and were in effect made in disregard of facts which were or should have been within defendant's knowledge; that while defendant represented that it would make at least 100,000 gallons of syrup, and perhaps 150,000 gallons, it in fact delivered to plaintiffs only about 38,000 gallons, which was wholly disproportionate to the representations made; that plaintiffs complied with all of their obligations under said contract, but defendant has failed and refused to carry out its obligations thereunder, and though often requested has failed and refused to deliver to plaintiffs the balance of about 62,000 gallons of syrup due them under said contract; that plaintiffs made every effort to minimize their damage and save defendant harmless by the purchase of other syrup, but were unable to do so. Plaintiffs further alleged that they made a profit of approximately 11 cents per gallon on the 38,000 gallons of syrup delivered to them by defendant, and that they would have secured and made a profit of 11 cents per gallon on the average upon the 62,000 gallons of syrup which de-

⊂⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

fendant failed to deliver to plaintiffs, and they prayed for the recovery of said profits.

To this petition defendant set up a general demurrer and special exceptions, and replied with a general denial and special answer, alleging that on the 10th of November, 1916, it entered into a written contract with plaintiffs, by the terms of which contract defendant obligated and bound itself to sell and deliver to said plaintiffs during the grinding season of 1916 all of the syrup manufactured by defendant at its mill at House, Tex., in Fort Bend county, no more or no less; that it was specially understood and agreed, and the contract so provided, that defendant was to sell and deliver to plaintiffs only the syrup that was manufactured by defendant at its mill at House, Tex.; and that it was specially understood by plaintiffs at the time the contract was entered into that the estimate of 100,000 gallons of syrup mentioned in said contract was purely and only an estimate of the output of defendant's mill for the grinding season of 1916, and that said contract was not in terms, or by any legal implication, a warranty, or in the nature of a warranty, which required defendant to deliver 100,000 gallons of syrup, more or less, with slight variations, but only required defendant to deliver to plaintiffs such syrup as was manufactured at its mill at House, Tex. Defendant further alleged that it in good faith complied with all the obligations imposed upon it by the terms of the contract; that it did sell and deliver to plaintiffs all of the syrup manufactured at its mill at House, Tex., in Fort Bend county, for the grinding season in question; that it is guilty of no default in the failure to deliver to plaintiffs any more syrup than that manufactured at said mill. Defendant further denied that it had entered into any contract with plaintiffs except the written contract hereinbefore referred to; that it refused to contract with plaintiffs except in writing, and that it was understood by it and plaintiffs at the time the written contract was entered into that said contract covered all the conditions of their trade, and there were no other conditions except those provided for in the written contract; that at the time said contract was entered into plaintiffs' agent, R. B. Hamlett, had been upon defendant's farm and examined the cane crop; that he was informed by defendant's agent of the quantity of syrup manufactured the previous year; and that the quantity of syrup manufactured the previous year was more than 100,000 gallons, which plaintiffs were notified of, and plaintiffs understood that defendant could only estimate the quantity of syrup to be manufactured by it.

The cause was submitted to a jury in the court below upon the following special issues:

"Special Issue No. 1. Did the plaintiffs and the defendant mutually intend to buy and sell 100,000 gallons of syrup, with small and immaterial variations? Answer Yes or No.

"Special Issue No. 2. Did William Doherty, the agent of the defendant, at the time of making the contract, and during the negotiations leading up to it, believe, and in good faith represent to plaintiffs, that the defendant would make as much as 100,000 gallons of syrup? Answer Yes or No.

"Special Issue No. 3. Was the estimate made by the said Doherty of 100,000 gallons of syrup to be made by defendant wildly and recklessly made? Answer Yes or No.

"Special Issue No. 4. At the time plaintiffs and defendant were negotiating for this contract, and at the time the contract was signed, was the quantity of syrup which the defendant would manufacture at its mill capable of reasonably accurate ascertainment? Answer Yes or No.

"Special Issue No. 5. Would the plaintiffs have made the contract with defendant had they known or believed that defendant would deliver only about 39,000 gallons of syrup? Answer Yes or No.

"Special Issue No. 6. Would the defendant have made the contract with plaintiffs to sell them any more syrup than it produced? Answer Yes or No.

"Special Issue No. 7. What profit per gallon would plaintiffs have made on the syrup which was not delivered to them? Let your answer state the amount in cents per gallon."

The jury found in the affirmative upon issues Nos. 1, 2, 3, and 4, and in the negative upon issues Nos. 5 and 6. In response to issue No. 7 the jury found "11 cents per gallon."

Upon this verdict, and the finding by the court from the evidence that at the time the contract was made it was in the contemplation of the parties that the plaintiffs would make a profit upon the syrup purchased from the defendant, and the further finding that of the 61,269 gallons of syrup which defendant failed and refused to deliver plaintiffs had contracted to sell 29,930 gallons, judgment was rendered in favor of plaintiffs for 11 cents per gallon on said 29,930 gallons, aggregating the sum of $3,292.30.

[1] There is little, if any, conflict in the testimony upon any of the issues raised by the pleadings. At the time the contract was made defendant's vice president and manager, Mr. Wm. Doherty, who acted for it in the preliminary negotiations and the execution of the contract, believed that the crop of growing cane which he contemplated manufacturing into syrup would produce 100,000 gallons and might produce as much as 150,000 gallons, and so stated to plaintiffs, who had no knowledge as to the probable yield of the crop, relied upon the representations of Mr Doherty. and expected and believed that they would receive under the contract approximately 100,000 gallons of syrup. The evidence shows that defendant only delivered to plaintiff 38,741 gallons. There is no allegation in the petition nor any evidence tending to show that defendant did not de-

liver to plaintiffs all of the syrup manufactured by it during the season covered by the contract. Such being the state of the pleading and evidence, plaintiffs' right of recovery depends upon whether the contract between the parties was one for the sale of 100,000 gallons of syrup or a contract which only bound defendant to deliver to plaintiffs the syrup manufactured by it during the grinding season of 1916. We have had no difficulty in reaching the conclusion that the contract only bound defendant to deliver to plaintiffs the syrup manufactured by it at its mills at House, Tex., during the grinding season of 1916, and that the statement of the amount of syrup made in the contract was intended, as recited in the contract, to be only an estimate. This is the plain, unequivocal language of the writing:

"The seller agrees to manufacture and deliver," and the "buyer agrees to purchase, during the cane-grinding season of 1916, all of the syrup manufactured by the seller at its mill at House, Tex., in Fort Bend county, estimated to be about 100,000 gallons, more or less."

[2, 3] There is no doubt or ambiguity in this language, and it matters not what may have been the intention of the parties; in the absence of allegations of fraud or mistake, no evidence can be considered which changes the obligation expressed in the writing. Bruner Bros. v. Strong, 61 Tex. 555; Wooters v. Railway Co., 54 Tex. 294; Milliken v. Callahan County, 69 Tex. 205, 6 S. W. 681.

Our holding that the written contract is unambiguous and can only be construed as a contract to sell and deliver the syrup manufactured by defendant during the 1916 season is well sustained by the authorities. In the case of Brawley v. United States, 96 U. S. 168, 24 L. Ed. 622, which was a suit to recover the contract price of 840 cords of wood alleged to have been contracted to be purchased by the defendant, the Supreme Court of the United States thus states the rule:

"Where a contract is made to sell or furnish certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped by his agent or correspondent in certain vessels, and the quantity is named with the qualification of 'about,' or 'more or less,' or words of like import, the contract applies to the specific lot; and the naming of the quantity is not regarded as in the nature of a warranty, but only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it. In such cases, the governing rule is somewhat analogous to that which is applied in the description of lands, where natural boundaries and monuments control courses and distances and estimates of quantity.

"But when no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is material, and governs the contract. The addition of the qualifying words 'about,' 'more or less,' and the like, in such cases, is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure, or weight.

"If, however, the qualifying words are supplemented by other stipulations or conditions which give them a broader scope or a more extensive significancy, then the contract is to be governed by such added stipulations or conditions. * * * So where a manufacturer contracts to deliver at a certain price all the articles he shall make in his factory for the space of two years, 'say 1,000 to 1,200 gallons of naphtha per month,' the designation of quantity is qualified not only by the indeterminate word 'say,' but by the fair discretion or ability of the manufacturer, always provided he acts in good faith."

The court held that plaintiff could not recover for the 840 cords. The court, in its opinion, further said:

"Reference is made to the previous negotiations which led to the making of the contract, the bid of the claimant, the fact that the contract was awarded to him on his bid as early as May, and that, on the faith and expectation that the quantity named would be wanted, he had cut the 880 cords of wood before the contract was signed.

"All this is irrelevant matter. The written contract merged all previous negotiations, and is presumed, in law, to express the final understanding of the parties. If the contract did not express the true agreement, it was the claimant's folly to have signed it. A court cannot be governed by any such outside considerations. Previous and contemporaneous transactions and facts may be very properly taken into consideration to ascertain the subject-matter of a contract, and the sense in which the parties may have used particular terms, but not to alter or modify the plain language which they have used."

In the case of Loeb v. Winnsboro Cotton Oil Co., 93 S. W. 515, in which writ of error was denied by the Supreme Court, a contract for the sale of linters which stipulated that the seller confirmed the sale to the buyer of the season's output of linters, estimated to be at 200 or 250 bales, was construed by the court. The total output of cotton for that season was 338 bales. The buyer claimed he was only bound to receive 250 bales of the cotton. The seller believed that under the contract he was bound to receive 338 bales, as that was the season's output, and that 250 bales was simply an estimate of what the season's output would be. The court held that the contract was for the sale of the entire output by the seller for that season, regardless of the number of bales estimated. The case of Brawley v. United States, cited above, was followed by the court in this case, and was quoted from at length.

In the case of Inman Bros. v. Dudley, 146 Fed. ·449, 76 C. C. A. 659, the defendants contracted to sell and deliver to plaintiffs at agreed prices all of the lumber they had on hand at their mill and loading station, which was "estimated" at about 800,000 feet of oak, 300,000 feet of gum, also their "entire cut" of lumber during the year 1903, "estimated to be 1,500,000 feet, more or less," of oak, and including the stock on hand, and 1,000-000 feet, more or less, of gum; the court held that said contract was not one for the sale of a definite quantity of lumber, but defendants' entire stock on hand at their mill and shipping station, much or little, and of whatever quantity they should cut during the year 1903, regardless of departures from estimates, in the absence of fraud. This case went up from Tennessee to the Circuit Court of Appeals, and the opinion was written by Justice Lurton.

In the case of Burt v. Garden City Sand Co., 237 Ill. 473, 86 N. E. 1055, it was held that the contract to sell the entire "output" of a cement mill for a year requires the seller to deliver no more than he actually produced in the mill during the year, though the production does not equal the estimated capacity of the mill, and the mere expectation of the buyer that it would be operated to its full capacity cannot be imported into the contract.

In the case of Bautovich v. Great Southern Lumber Co., decided by the Supreme Court of Louisiana, found in 129 La. 857, 56 South. 1027, Ann. Cas. 1915B, 848, an agreement to sell all charcoal manufactured by defendant's mill within a certain time, "estimated at two or more cars per week," was held not to imply a warranty of quantity by defendant, but only an estimate of the probable amount, in reference to which good faith is all that is required of the party making it.

Appellee cites and relies upon the case of Taylor v. Early, 204 S. W. 1179, to sustain the judgment of the trial court. We think the contract in that case may be distinguished from the one we are considering. It is not copied in the opinion of the court, but the opinion states that it was a contract to sell from 850 to 950 bales of cotton, the estimated output of the defendant for the season of 1915-16. The opinion is rested upon the conclusion that the contract, by its express terms, was for the sale of a specific number of bales, and it may be that the language of the instrument as a whole justified the court in giving it that construction.

Other cases cited by appellee are cases of gross misrepresentation of one of the parties as to quantity of the "stock," or "output," contracted to be sold, or the quantity which the buyer would use, when the correct quantity was known or easily ascertainable by the party making the misrepresentation.

In such cases the innocent party, if he is the purchaser, is not required to take a quantity unreasonably disproportionate to the estimate, and if in reliance upon such misrepresentation of one party the other has incurred expenses and sustained consequential damage such damage may be recovered. But this is not the case made by plaintiffs' pleading and evidence. This suit is brought upon the theory that the contract bound appellant to deliver 100,000 gallons of syrup, and that its failure to deliver that amount was a breach of the contract which entitled plaintiffs to recover the profits they would have made upon a resale of the syrup.

We agree with appellant that under the pleadings and evidence plaintiffs were not entitled to recover in this suit, and the trial court should have granted defendant's request to instruct the jury to return a verdict in its favor. It follows from these conclusions that the judgment should be reversed and judgment here rendered for appellant, and it is so ordered.

Reversed and rendered.