## Richmond.

MATHIESON ALKALI WORKS, ET ALS. V. VIRGINIA BAN-
NER COAL CORP., ET ALS.

January 20, 1927.

1. PAROL EVIDENCE—*Construction of Requirement Contract—Case at Bar.*—
The instant case arose from a contract between an alkali company
and a coal corporation, under which the alkali company agreed to
buy and the coal corporation agreed to sell during a term of years
"the annual requirements of coal of the alkali works, estimated
approximately at 200,000 tons per annum, to be delivered as speci-
fied by the alkali company."

   *Held:* That there was no such ambiguity upon the question of quantity
as would admit of the introduction of parol evidence to aid in the
construction of the contract.

2. PAROL EVIDENCE—*General Rule.*—Parol testimony cannot be received
to contradict, vary, add to or subtract from the terms of a valid
written instrument. Extrinsic evidence to determine the sense in
which language is used is inadmissible unless the contract is am-
biguous.

3. PAROL EVIDENCE—*Written Contract Deemed to Express the Entire Mean-
ing of the Parties—Prior Conversations and Parol Agreements.*—Where
there is no imperfection or ambiguity in the language of a contract,
it will be deemed to express the entire and exact meaning of the
parties, that every material part of the contract is therein expressed.
On the same principle all conversations and parol agreements be-
tween parties prior to the written agreement are so merged therein
that they cannot be given in evidence for the purpose of changing
the contract or showing an intention or understanding different
from that expressed in the written agreement.

4. SALES—*Construction of Contract—Sale of Coal to Meet the "Requirements"
of an Alkali Works—Case at Bar.*—The instant case arose from a con-
tract between an alkali company and a coal corporation under which
the alkali company agreed to buy and the coal corporation agreed
to sell during a term of years "the annual requirements of coal of the
alkali works, estimated approximately at 200,000 tons per annum,
to be delivered as specified by the alkali company." The coal
company asserted that this was a tonnage contract for 200,000 tons
a year, but the terms used in the contract have been almost uni-

versally held to express an agreement for requirements only; and' the plain language of the contract shows it to be a "requirements" contract. The presence of the estimate does not change the "requirements" character of the contract.

5. SALES—*Construction of Contract—"Requirements" Contract.*—Where a contract of sale provides for the furnishing of "requirements" for a given time, followed by an estimate, about, approximately, more or less, or expressions of like import, the word "requirements" is regarded as the determinative or dominant measure of the quantity contracted for and the subsequent language as merely an estimate.

6. SALES—*Construction of Contract—"Requirements" Contract.*—Where a contract of sale provides for the furnishing of the "requirements" of the buyer for a given time followed by an estimate of such "requirements," if the contract was for a definite quantity or approximately a definite quantity, why were so many words used to express this very simple idea? The answer is that the parties must have meant the added words to mean something when they were inserted in the contract. They cannot later, when controversies arise, ask the courts to cast them aside as meaningless.

7. SALES—*"Requirements" Contract—Uncertainty of Contract.*—The phrase "requirements" in a contract to furnish the "requirements" of the buyer for a given time is not too uncertain in itself to constitute the subject matter of a contract.

8. SALES—*Construction of "Requirements" Contract—Case at Bar.*—The instant case arose from a contract between an alkali company and a coal corporation, under which the alkali company agreed to buy and the coal corporation agreed to sell during a term of years "the annual requirements of coal of the alkali works, estimated approximately at 200,000 tons per annum, to be delivered, as specified by the alkali company," in approximately equal monthly installments, of the following proportions and grades: 133,000 tons of nut and slack coal * * * 67,000 tons of egg and lump coal * * *." The coal company contended that these two quantities which make up 200,000 tons indicated that precisely that annual quantity was the subject matter of the contract, but this argument overlooked the force of the word "proportions" in this connection. The use of that word shows that the figures given merely expressed a ratio and not absolute quantities. Otherwise the language should have been "of the following amounts and grades."

9. SALES—*"Requirements" Contracts—Good Faith.*—Where the quantity of the subject of the sale is the "requirements" of the purchaser a willful and arbitrary juggling of "requirements" of the purchaser will not be countenanced. A contract for "requirements" is not a contract for such quantity as the purchaser may see fit to order, but a contract for such quantity as is requisite to supply its reasonable wants. Execution in good faith is required of the purchaser; the

courts are zealous to guard against any injustice or inequality which might arise out of such contracts.

10. SALES—*"Requirements" Contract—Parol Evidence—Case at Bar.*—The instant case arose from a contract between an alkali company and a coal corporation, under which the alkali company agreed to buy and the coal corporation agreed to sell during a term of years "the annual requirements of coal of the alkali works, estimated approximately at 200,000 tons per annum," to be delivered as specified by the alkali company.

*Held:* That while parol evidence cannot be introduced, the effect of which would be to strike out the phrase "annual requirements" and the word "estimated," it may be introduced on the merits to show what the *bona fide* "annual requirements" of the alkali works were.

11. SALES—*Specifications Detached from the Contract—Identification—Case at Bar.*—The instant case was a "requirements" contract under which seller was to furnish the buyer with the coal required by it of the quality shown from the specifications "hereto attached." When the contract was produced in evidence the specifications were not attached to it.

*Held:* That the buyer was entitled to identify the specifications which the parties actually agreed upon as fixing the standard of quality; that the quality must conform to such specifications, and that extrinsic evidence of any other standard is inadmissible.

12. CONTRACTS—*Construction—Parol Evidence—Instrument Referring to Another Writing.*—Where a written instrument contains a reference to some other writing, parol evidence is admissible for the purpose of identifying the writing so referred to.

13. SALES—*Price—Parol Evidence—Case at Bar.*—The instant case arose out of a sale of coal. As to the price of the coal agreed upon there was no ambiguity in the contract.

*Held:* That no parol evidence was necessary or competent to explain the price clause or assist in its construction.

14. BILL IN EQUITY—*Amended Bill—Contract and Tort.*—In the instant case, a suit involving the breach of a contract of sale between complainant and defendant, to allow a claim for damages arising out of an alleged tort to be injected, by amended bill, into the suit for damages for a breach of contract, and in effect permit the change of one section of complainant's cause of action from contract to tort, cannot be permitted.

15. SALES—*Supplemental Agreement as to Price—Pleading—Case at Bar.*— In the instant case, a suit involving a breach of contract of a sale of coal, at no stage of the proceedings did complainant allege facts sufficient to constitute a cause of action upon any agreement subsequent to the original contract. It was, therefore, error to decree that the price fixed by the original contract was subject to an alleged supplemental agreement as to price.

Appeal from a decree of the Circuit Court of Dicken-- son county. Decree for complainant. Defendant appeals.

*Reversed and remanded.*

The opinion states the case.

*Buchanan & Buchanan, Hutton & Hutton, White Penn & Stuart, Rushmore, Bisbee & Stern,* for the appellant.

*E. M. Fulton, W. H. Rouse, Walter H. Robertson* and *Joseph L. Kelly,* for the appellees.

CHICHESTER, J., delivered the opinion of the court.

This cause has twice before reached this court upon appeal. The first appeal was dismissed by the appel-- lant (alkali works), the second appeal was dismissed by this court as improvidently awarded (see *Mathieson Alkali Works* v. *Virginia Banner Coal Corp., etc.,* 140 Va. 89, 124 S. E. 470). The practical result of this decision was that the chancellor should have construed the con-- tract, which was the basis of the controversy between the alkali works and the coal corporation, before re- ferring the cause to a commissioner to take proof on the issues raised therein. Upon receipt of the mandate from this court the trial court vacated the order of reference, and by decree entered on August 28, 1925, after the taking of much evidence introduced by both parties, the purpose of which was to assist the court in the construction of the contract, construed the con-- tract against the contention of the alkali works. The present appeal is from this decree, and the question in-- volved is the correctness of the construction adopted by the trial court.

In 1917, the coal company owned a lease for a long term on a boundary of coal land, but it had neither funds, plant nor equipment to mine coal and hence was producing none.

The alkali works was an established manufacturing industry operating a large plant and using a large quantity of coal.

On September 1, 1917, a written contract was entered into between the alkali works and the coal company, which provided in substance as follows: First: (a, b, c) The alkali works agreed to loan the coal corporation $150,000.00, and the stockholders agreed to provide an additional $50,000.00 for the development of the premises and place same in condition for the delivery of coal as thereinafter provided.

"Second: (a) The alkali works agrees to buy and pay for and the coal corporation agrees to sell and deliver, f. o. b. cars at the mines, for and during the term of ten (10) years from April 1, 1918, until April 1, 1928, at the price hereinafter specified, the annual requirements of coal of the alkali works, estimated approximately at 200,000 tons per annum, to be delivered, as specified by the alkali works, in approximately equal monthly installments, of the following proportions and grades: 133,000 tons of nut and slack coal, such as will pass through bar screen, the bars of which are one and one-half inches apart; 67,000 tons of egg and lump coal, such as will not pass through bar screen, the bars of which are one and one-half inches apart, and will pass through bar screen, the bars of which are four (4) inches apart.

"The said two grades of coal shall be of such quality as is required, as of this date, by the United States Government for coal supplied to the Soldiers' Home at Johnson City, Tennessee, and shown upon the specifications hereto attached, marked 'specifications.'

"(b) Payment for the said coal shall be made by the alkali works to the coal corporation monthly, on or before the 20th day of each month, for the coal so delivered during the preceding month, price per ton to be paid by the alkali works for said coal shall be in the average per ton cost f. o. b. cars during the month in which the coal is mined, plus a profit of twenty-five cents ($0.25) per ton; provided, however, that in determining such price the item representing the cost per ton f. o. b. cars shall in no event exceed the 'standard cost' as hereinafter defined, and, in the event that during any month the coal corporation's cost per ton exceeds such standard cost, the alkali works shall pay for the coal mined during such month standard cost plus a profit of twenty-five cents per ton. The term 'standard cost' as used in this agreement shall mean the average cost per ton f. o. b. cars for any such month or months of the coal mined by the Stonega Coal and Coke Company at their Southwest Virginia operations. In event detailed cost figures of said companies for any month are not available to the parties hereto, then the cost per ton to be charged the alkali works shall be the average cost per ton f. o. b. cars during said month of three efficiently managed and well located collieries at the time operating in the Southwest Virginia coal fields, which cost of production shall be determined from the best evidence by a majority of three competent, disinterested arbitrators, to be named as hereinafter, in section fourth, paragraph (a), provided; cost of any such arbitration to be borne equally by the alkali and the coal corporation.

"The alkali works, or its duly authorized agent, for the purpose of ascertaining the coal corporation's cost per ton, shall be entitled to demand and receive

from the coal corporation all information relating to and necessary for the matter of such determination, and to verify the same by an examination and audit of the books, records and accounts of the coal corporation.

"(c) The coal corporation agrees that all coal sales made by it to third persons shall be made subordinate to and dependent upon the said delivery to the alkali works of its average monthly coal requirements.

"If (for certain exempting causes) the coal corporation is unable to so deliver, or the alkali works is unable to use said coal, then and to the extent only of such inability either as the case may be shall be relieved of its agreement to deliver or to take said coal during the period of said preventing causes.

"(e) If the coal corporation for any other than the foregoing causes fail for seven. or more consecutive days so to deliver to the alkali works its average daily requirements, then the alkali works shall have the absolute right to purchase in the open market the coal required by it and charge the coal corporation with the difference between the contract price and the price paid in the open market plus all additional costs incurred, or losses resulting from said failure; and the alkali works may cancel the whole contract if said excesses and losses shall not be paid in five days after demand.

"(f) If the coal corporation's failure so to deliver continues for a period of thirty days or longer, the alkali works during the remainder of the term of the contract shall receive its said requirements of coal at actual cost of production.

"Third: (a and c) To secure to the alkali works the performance of this agreement of the coal corporation to deliver coal as herein provided and the right to

manage the affairs of the coal corporation, the stockholders were required to deposit and pledge, with proxies attached, sixty per cent of the authorized capital stock of the coal corporation with the alkali works on condition (*inter alia*) that if the coal corporation fail to deliver the average coal requirement as herein provided for a period of thirty days or longer (excluding exempted periods) then and in such event the alkali works shall have the right to take and have full and complete power of voting sixty per cent of the capital stock for the remainder of the term of the contract at all stockholders' meetings of the coal corporation.

"Fourth: This section provides for the arbitration of questions relative to performance of the contract, quantities to be delivered, failure to deliver, costs, right of alkali works to take the stock, etc."

The original bill was filed by the coal company, alleging various breaches of the contract of September 1, 1917, which was exhibited with the bill, claiming large damages therefor, and also alleging an effort on the part of the alkali works to work the financial ruin of the coal company. The bill insisted that the contract required the alkali works to take 200,000 tons of coal per annum, and averred its willingness and ability to perform the contract as to quantity, quality and grades of coal to be furnished by it. The bill also prayed for a mandatory injunction to require the alkali works, in the future, to receive and pay for 200,000 tons of coal per annum, and also a large sum of money for having failed theretofore to take coal from it at that rate.

Subsequently, the alkali works filed its answer and cross-bill, claiming large damages for alleged breaches of the contract of September 1, 1917, on the part of the coal company.

The coal company then filed its answer to the cross-bill in which it undertook to deny every affirmative allegation of new matter set up in the cross-bill. The cross-bill had set up the construction by the alkali works of the contract of September 1, 1917, on the subjects of (1) the quantity of coal the contract required the alkali works to purchase of the coal company annually; (2) the price per ton to be paid by the alkali works, and (3) the quality of coal to be furnished by the coal company. The answer of the coal company denied that the alkali works had put the proper construction upon the contract and set out in detail its construction thereof. It will thus be seen that the parties are at issue upon the construction of clause (a) of the "second" section of the contract which relates to the quantity and quality of the coal contracted for and they are at issue as to the construction of clause (b) of the "second" section of the contract as to the price of the coal. Thus we have presented here for decision three clear cut issues which will be taken up and discussed in order.

The trial court's construction of the contract embodied in the decree of August 28, 1925, practically sustains the position of the coal company upon its contention as to quantity, price and quality. The pertinent parts of this decree appear in the margin.

(1) The quantity of coal to be delivered by the Virginia Banner Coal Corporation and taken by the Mathieson Alkali Works per year under the contract was 200,000 tons, subject to slight and unimportant deficiencies, and subject to the exemption causes mentioned in the contract.

(2) The quality of the coal to be delivered and taken under said contract was such as was required by the United States Government on September 1, 1917, for the coal supplied the Soldiers' Home at Johnson City, Tennessee, but as appears from the evidence no "specifications" showing any particular chemical content having been agreed upon and attached to the contract, said quality will be determined by such requirement as the Government had in force and under which coal for the Soldiers Home was purchased at that date, which are shown on printed forms of the Government, filed in the record with the deposition of Capt. R. H. Bailey, marked "Specifications for Purchase of Bituminous Coal for National Home for Disabled Volunteer Soldiers," dated May 4, 1917.

To make clear the respective positions of the parties as to the construction of the contract as to the quantity of coal contracted for, the coal company asserts that the contract was a tonnage contract, that is that it provided for the sale and delivery by the coal company of 200,000 tons of coal per annum for a period of ten years to the alkali works, which the latter agreed to receive and pay for at a price provided for by clause (b) of the second section of the contract.

The alkali works asserts that as far as quantity is concerned the contract is a "requirements" contract. That is to say, the alkali works was only bound to take and pay for such a quantity of coal per annum from the coal company as was necessary to meet its requirements in the operation of its manufacturing plant.

Before passing upon the question now under discussion it is proper to say that the alkali works further contended that, upon the question here being considered, the written contract was plain and unambiguous and that parol testimony was not necessary to aid in its construction, nor competent, for that purpose. The

(3) The price to be paid by the Mathieson Alkali Works under said contract for the coal to be supplied by the coal corporation was cost of production plus a profit of twenty-five cents per ton, subject to such subsequent agreement as to additional profit per ton as complainant may be able to establish, but not subject to the limitation as to cost of production mentioned in the contract of September 1, 1917, if it shall appear as the evidence thus far indicates that said limitation or standard was rendered impossible of performance by virtue of the default of the Mathieson Alkali Works in taking said tonnage per year mentioned above, and in the manner provided by said contract.

The court, being of opinion that it is proper to appoint a commissioner herein, doth appoint S. W. Coleman, Esq., as such special commissioner, who shall, in accordance with the foregoing construction of said contract, take proof of the issues raised by the pleadings herein and in support of the respective claims of the parties hereto as set forth in such pleadings, and upon such testimony and the proceedings had herein, shall report upon the claims of the respective parties and the validity of same, and the amounts, if any, due and owing to either or each of said parties by the other; and shall also take proof and report specially upon any matter, within the issues made by the pleadings, deemed pertinent by himself or requested by any party in interest; and with his report shall return all documentary or other evidence taken by or filed before him; and as to any hearing which he may

position of the coal company is that the contract, with reference to quantity, admits of more than one construction, and that oral evidence is permissible to ascertain the meaning of the parties, but if this is not so the contract upon its face provides for the sale, delivery and purchase of a definite tonnage of coal per annum, subject to slight and unimportant deficiencies and subject to the exemption causes mentioned in the contract.

It is not necessary to notice specifically the numerous errors assigned. The sole question for consideration is the construction of the contract as it relates to the three matters in controversy.

If the construction of the trial court is correct, then its decree affirmed is the proper guide for the commissioner in his inquiries upon the merits. If the construction of the trial court is not correct, in the opinion of this court, then the decree of this court must be the chart by which the findings of the commissioner are determined.

[1] As we view the contract there is no such ambiguity upon the question of quantity as would admit

hold, he shall first give to the parties ten days' notice of the time and place of such hearing.

And thereupon defendant by counsel moved the court to show by this decree as follows:

(1) Whether the court decided the said contract to be ambiguous or unambiguous upon the points submitted for construction;

(2) Whether the court considered the extrinsic evidence produced in aid of construction to be admissible or inadmissible, and whether said evidence was taken into consideration by the court in reaching the decision above set forth;

(3) Whether the said contract was a tonnage contract or a requirements contract;

(4) Whether or not the Upper Banner seam was the only seam from which complainant was bound by said contract to furnish coal to defendant, inasmuch as that question was fully argued and briefed before the court when the case was submitted.

But the court refused to add to his decision.

And thereupon, the defendant, signifying its intention of applying for an appeal herein, it is ordered that the operation of this decree be suspended for a period of ninety days upon the defendant entering into bond in the penalty of $5,000.00 before the clerk of this court within ten days of this date, conditioned according to law.

of the introduction of parol evidence to aid in its construction.

[2] The parol evidence rule is usually stated as follows: "Parol testimony cannot be received to contradict, vary, add to or subtract from the terms of a valid written instrument." Jones, Ev. (2d ed.) page 543.

[3] Of course counsel for the coal company assert that they are not attempting to vary, add to or subtract from the terms of the written contract, but they claim that the contract is ambiguous and that under the corollary to the above rule, parol evidence is admissible to determine the sense in which the language is used. The same learned author states the corollary as follows: (Jones Ev. 2nd ed. 545): "It is but a corollary of the main position that, where there is no imperfection or ambiguity in the language of contract, it will be deemed to express the entire and exact meaning of the parties—that every material part of the contract is therein expressed. On the same principle all conversations and parol agreements between the parties prior to the written agreement are so merged therein that they cannot be given in evidence for the purpose of changing the contract or showing an intention or understanding different from that expressed in the written agreement."

The rule and the corollary have long been recognized and always adhered to in Virginia (*Towner* v. *Lucas*, 13 Gratt. [54 Va.] 705; *Knick* v. *Knick*, 75 Va. 12; *Albert* v. *Tidewater Railroad Co.*, 107 Va. 256, 58 S. E. 575); and no rule is better settled in this State than that extrinsic evidence is not admissible to determine the sense in which language is used unless the contract is ambiguous. *Cutchin* v. *Roanoke*, 113 Va. 452, 74 S. E. 403; *Patterson* v. *Overbey*, 117 Va. 345, 84 S. E. 647; *Roanoke* v. *Blair*, 107 Va. 639, 60 S. E. 75; *Grubb* v. *Burford*, 98 Va. 553, 37 S. E. 4; *Bank* v. *McVeigh*, 32 Gratt. 530.

That there is no such ambiguity as to quantity as will admit the introduction of parol evidence will sufficiently appear from an analysis of the contract and the citation of authorities construing similar contracts.

[4] There certainly is nothing in subsection (a) of the second section of the contract that admits of any doubt as to the measure of the quantity of coal contracted for. Was the measure the "requirements" of the alkali works, or was it approximately 200,000 tons?

There are two quite conclusive answers to this questions: First, the terms used in the contract have been almost universally held to express an agreement for requirements only; second, the plain language of the contract shows it to be a "requirements" contract.

Contracts very similar to the contract here, that is contracts providing for supplying requirements, followed by estimates, including the estimate of a specific quantity, have frequently had judicial interpretation in this country, and the courts have generally held that the presence of the estimate does not change the "requirements" character of the contract.

The principle was laid down in the leading case of *Brawley* v. *United States*, 96 U. S. 168, 24 L. Ed. 622. The litigants in that case occupied the same position, with reference to the contract there, as the litigants in the instant case occupy here. In the opinion this is said: "Where a contract is made to sell or furnish certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped by his agent or correspondent in certain vessels, and the quantity is named with the qualification of 'about' or 'more or less,' or words of like import, the contract applies to the specific lot; and the naming of

the quantity is not regarded as in the nature of a warranty, but only as an estimate of the probable amount, in reference to which *good faith* is all that is required of the party making it. In such cases, the governing rule is somewhat analogous to that which is applied in the description of lands, where natural boundaries and monuments control courses and distances and estimates of quantity.

"But when no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is material, and governs the contract. The addition of the qualifying words, 'about,' 'more or less,' and the like, in such cases, is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure or weight.

"If, however, the qualifying words are supplemented by other stipulations or conditions which give them a broader scope or a more extensive significance, then the contract is to be governed by such added stipulations or conditions. As, if it be agreed to furnish so many bushels of wheat, more or less, according to what the party receiving it shall require for the use of his mill, then the contract is not governed by the quantity named, nor by that quantity with slight and unimportant variations, but by what the receiving party shall require for the use of his mill and the variation from the quantity named will depend upon his discretion and requirements, so long as he acts in good faith. So where a manufacturer contracts to deliver at a certain price all the articles he shall make in his factory for the space of two years, 'say a thousand to twelve hundred gallons of naptha per month,' the designation of quantity is

qualified not only by the indeterminate word 'say,' but by the fair discretion or ability of the manufacturer, always provided he acts in good faith." Page 171 (24 L. Ed. 622).

Applying those principles to the contract before it, the court, after quoting the language as above stated, said: "These are the determinative words of the contract, and the quantity designated, eight hundred and eighty cords, is to be regarded merely as an estimate of what the officer making the contract at the time supposed might be required. The substantial engagement was to furnish what should be determined to be necessary by the post commander for the regular supply for the year, in accordance with army regulations." Page 173 (24 L. Ed. 622).

The language of the alkali works' agreement of September 1, 1917, more clearly evidences the intention of the parties to contract for requirements than the language used in the Brawley contract. There the language was "880 cords * * * more or less, as shall be determined to be necessary * * * for the regular supply," etc. In the alkali works' contract, guarding against any possibility of interpreting it as a contract to purchase and sell 200,000 tons per annum, the parties contracted for "the annual requirements of coal of the alkali works," expressly stating that the specific tonnage mentioned was but an estimate.

In *Berk* v. *International Explosives Co.*, 7 Commercial Cases, 20 (Eng. 1901), the contract and the facts were similar in many respects to those herein involved. The quantity and description of the goods contracted for were thus stated: "All our requirements of nitric acid * * * and sulphuric acid * * * and which requirements are estimated at 500 tons of nitric acid and 750 tons of sulphuric acid during

twelve months from date of the first delivery." The seller sued to recover damages on account of the failure of the purchaser to take 500 tons of nitric acid and 750 tons of sulphuric acid. In construing the contract, the court said: "Now, the contract is one by which the company agreed to buy from the plaintiffs, not so many tons of acid, but 'all our requirements' during twelve months. It is true that those requirements are estimated at 500 tons and 750 tons, respectively, of each kind of acid, and if the works had been completed the company would no doubt have taken the quantities, but I can find nothing in the contract binding the company to take that amount if it turned out that they did not require so much. I cannot strike out the words 'all our requirements,' and in my opinion the company was not bound by the contract to take more than was required in the business. * * * The conclusion I have come to is that the extent of Horn's obligations under the contract was that he should buy from the plaintiffs such acid as he required at the price fixed by the contract. Such a contract does not seem to me to be one which can be said to be extraordinary in its character or out of the ordinary course of a manufacturing business." (Page 21.)

In *National Publishing Co.* v. *International Paper Co.*, 269 Fed. 903, the contract sued on was construed to be a "requirements" contract, and the court said: "If, as was certainly then thought by its officers, plaintiff had a business with legitimate requirements, the words used plainly import a requirements contract, unless the words 'estimated at 400 tons' have taken all meaning out of the rest of the document" * * *

"When by formal contract or a series of writings

more than one measure of an amount or quantity is given, it is the duty of the court to ascertain, in Justice Holmes' happy phrase, what is the 'obviously dominant measure' to be applied in respect of such amount or quantity. *Smoot* v. *United States*, 237 U. S. 42, 35 Sup. Ct. 540, 59 L. Ed. 829. We think that this contract itself furnishes as the dominant measure the quantity the publishing company's rotogravure business needed during the contract year. That what was needed could not be exactly defined at the year's beginning is the very essence of a requirement contract.

"Nor does the insertion of an estimated total change, *per se*, the nature of the agreement. In *Marx* v. *American, etc., Co.*, 169 Fed. 582, 95 C. C. A. 80, there was such a total more accurately stated than in the present instance, yet it was held that the vendee was entitled to his requirements, though they exceeded the estimate; while in *Tancred* v. *Steel Co.*, 15 A. C. 125, the contract was for the steel required in the construction of a great bridge, whereof the 'estimated quantity' was an exact number of tons, and it was held that the vendor had thereby secured the right to supply all the steel required for the bridge, though it turned out to be far more than the engineer's estimate. So also, for numerous citations, *Loudenback, etc., Co.* v. *Tennessee, etc., Co.*, 121 Fed. 298, 58 C. C. A. 220, 61 L. R. A. 402. The agreement before us, not being void, is a requirement contract, * * * ."

Other instructive and pertinent cases are *White* v. *Steel United States*, 38 App. D. C. 131; *Tancred, Arrol & Co.* v. *Steel Co. of Scotland, Ltd.*, 15 A. C. 125; *Wolff* v. *Wells, Fargo & Co.*, 115 Fed. 32; *Marx* v. *American Malting Co.*, 169 Fed. 582; *Gulf Refining Co.* v. *Brown-Lloyd Co.*, 167 S. W. 162 (Texas).

[5, 6] There are two main impelling reasons applying

to these cases which moved the courts deciding them to the conclusion that they were "requirement" contracts and not tonnage or pounds or other definite quantity contracts, and these reasons apply with full force to the instant case. They are, first, that where the contract provides for the furnishing of requirements for a given time, followed by an estimate, about, approximately, more or less, or expressions of like import, the word "requirements" is regarded as the determinative or dominant measure of the quantity contracted for and the subsequent language as merely an estimate; and second, that if the contract was for a definite quantity or approximately a definite quantity, why were so many words used to express this very simple idea? The answer is that the parties must have meant the added words to mean something when they were inserted in the contract. They cannot later, when controversies arise, ask the courts to cast them aside as meaningless.

The contention of the coal company necessarily is that the phrase "estimated approximately at 200,000 tons per annum" is the dominant measure of the quantity, and stamps the contract as a tonnage contract. We think the contention exaggerates the word "estimated." The courts have construed the meaning of the force of the word "estimated" in contracts such as we are construing here, time and again. See *Brown* v. *Crowell*, 108 Va. 131, 60 S. E. 623; *Marx* v. *American Malting Co., supra; Inman Bros.* v. *Dudley & Daniels Lumber Company*, 146 F. 449; *Brawley* v. *United States, supra; Smoot* v. *United States, supra; New England Dressed Meat & Wool Co.* v. *Standard Worsted Co.*, 165 Mass. 328, 43 N. E. 112, 52 Am. St. Rep. 516; *Mills-Carleton Co.* v. *Huberty*, 84 Ohio St. 81, 95 N. E. 383; *White* v. *United States, supra; Arcola*

*Sugar Mills* v. *Farmer Hamlett's Co.* (Tex. Civ. App.), 220 S. W. 385.

Analagous cases, involving the construction of contracts for sale and purchase of total output or production, with estimates of the quantity, are, *Loeb* v. *Winnsboro Cotton Oil Co.*, 93 S. W. 515 (Tex.); *Bautovich* v. *G. S. Lumber Company*, 129 La. 857, 56 So. 1026, Ann. Cas. 1913B, 848; *Rosenberg Bros. & Co.* v. *Beales*, 56 Cal. App. 212, 205 Pac. 18; *Kenan, McKay & Spier* v. *Yorkville Cotton Oil Company*, 109 S. C. 462, 96 S. E. 524, 1 A. L. R. 1387; *Id.* (C. C. A.) 260 Fed. 28; *Arcola Sugar Mills Co.* v. *Farmer Hamlett's Co.* (Tex. Civ. App.), 220 S. W. 385; *Stanfield* v. *Arnwine*, 102 Or. 289, 202 Pac. 559; *Rosenberg Bros. & Co.* v. *Beales*, 56 Cal. App. 212, 205 Pac. 18; *Smoot* v. *United States*, 237 U. S. 38, 35 S. Ct. 540, 59 L. Ed. 829; *Laclede Construction Company* v. *T. J. Moss Tie Co.*, 185 Mo. 25, 84 S. W. 76; *Hackett* v. *State*, 103 Cal. 144, 37 Pac. 156; *Fletcher* v. *Germain*, 82 Mich. 247, 46 N. W. 368; *Loudenback Fertilizer Co.* v. *Tennessee Phosphate Co.*, 121 Fed. 298, 61 L. R. A. 402.

[7] The contention of the coal company that the phrase "requirements" is too uncertain in itself to constitute the subject matter of a contract is answered universally by the authorities against the contention. The cases heretofore cited uphold this form of contract as binding, but numerous cases have specifically decided the question.

In *National Furnace Co.* v. *Keystone Mfg. Co.*, 110 Ill. 427, 433, the undertaking was this: "Appellant agreed to deliver in cars, at Sterling, Illinois, all the iron that appellee needed in its business during the then ensuing year, at $22.35 per ton. Appellee, on its part, agreed to take its year's supply of iron of appellant, and pay for the same $22.35 per ton   *   *   .

Appellee was engaged in a large manufacturing business, necessarily using a large quantity of iron in the transaction of its business * * . It cannot be said that appellee was not bound by the contract. It had no right to purchase iron elsewhere for use in its business * * * . Such contracts are not unusual. A foundry may purchase its supply of coal, for the season, of the coal dealer. A hotel may do the same. A city, for the use of the public schools, may engage its supply of coal for the winter, at a specified price. Such contracts are not uncommon, and we have never understood that they were void."

In *Excelsior Wrapper Co.* v. *Messinger*, 116 Wis. 549, 556, 93 N. W. 459, 461, the contract was for the paper which plaintiff would need in its business for one year. The seller failed to furnish the paper and claimed that the contract was void because it bound the plaintiff to take only what it might choose. The court said: "The plaintiff had an established business, of character and magnitude, well known to the defendant. It could not with profit to itself seriously modify the volume of that business for the mere purpose of increasing or diminishing the amount of any given class of supplies. The exact quantity of paper, therefore, which it would want or need in that business during a prospective year, while uncertain at the time of the making of the contract, was sure to become reasonably certain in the course of the year; and the contract was not merely an optional one with the plaintiff, but bound it as well to take, as it did the defendant to furnish, such paper, of the quality designated, as should be needed for the business."

See also *Wells* v. *Alexandre*, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; *Manhattan Oil Co.* v. *Richardson Lubricating Co.*, 113 Fed. 923; *Lima Locomotive Co.* v.

*National, etc., Co.*, 155 Fed. 77, 11 L. R. A. (N. S.) 713; *Minnesota Lumber Co.* v. *Whitebreast Coal Co.*, 160 Ill. 85, 43 N. E. 774, 31 L. R. A. 529; *Cullinan* v. *Standard Light & Power Co.* (Tex.), 65 S. W. 689.

Aside from the authorities which have held similar contracts to the one we are considering to be "requirements" contracts, the plain language of this contract admits of no other construction as to quantity than the one we have placed upon it.

It is incredible that business men with the aid of counsel could have worded this provision as they did, if they intended it to be a contract for the sale of 200,000 tons of coal per annum. The order of arrangement of the words in this section is significant, and places in the forefront of the provision the words "annual requirements" which would show that "requirements" was what the parties had in mind. We may fairly say, therefore, that the words "annual requirements" are, to use Mr. Justice Bradley's term, the "determinative words" of the contract, or in Mr. Justice Holmes' phrase its "obviously dominant measure."

The 200,000 tons phrase, being specifically an estimate and in a subordinate position, cannot, with any show of reason, be given the dignity of dominating the entire contract as the expression of its subject matter.

It is impossible to suppose that if this contract had been for the sale of 200,000 tons of coal per annum and not for the annual requirements of the alkali works, it would not have said so instead of saying the exact opposite. If the parties had meant that the alkali works agreed to buy and pay for and the coal corporation agreed to sell and deliver approximately 200,000 tons of coal per annum, they would have used these

words, instead of saying that the alkali works agreed "to buy and pay for," and the Virginia Banner Company agreed "to sell and deliver" * * * "the annual requirements of coal of the alkali works."

[8] It has been argued by counsel for the coal corporation that since the contract provides that the coal was to be delivered in approximately equal monthly installments "of the following proportions and grades: 133,000 tons of nut and slack coal * * 67,000 tons of egg and lump coal * * ," therefore, these two quantities, which make up 200,000 tons, indicate that precisely that annual quantity was the subject matter of the contract. Such an argument overlooks, however, the force of the word "proportions" in this connection. The use of that word shows that the figures given merely expressed a ratio and not absolute quantities. Otherwise the language should have been "of the following amounts and grades." The annual requirements having just been estimated at 200,000 tons, the contract very appropriately took fractions of that figure to express the ratio in which the two different grades of coal were to be delivered under the contract.

It has been argued by counsel that if this is a "requirements" contract, deliveries could not be made "in approximately equal monthly instalments." It is to be observed, however, that the same provision was included in the contract construed in the national publishing case, cited and quoted *supra*. The court in that case had no difficulty in construing the contract to be one for requirements.

As further strengthening this position, the quantity, 200,000 tons, is specifically stated to be an approximate estimate of the annual requirements.

In addition the use of the word "estimated" is most significant. If this is a "requirements" contract, it is

perfectly logical to add an approximate "estimate" of what the "requirements" will be. On the other hand, if this is a contract for approximately 200,000 tons, what is it that is "estimated?" The answer must be that the "requirements" are "estimated." But if this is a contract for approximately 200,000 tons, what is the need for estimating the buyer's "requirements?" The answer is that there could be no need for such an estimate.

When we go outside of the quantity provision itself, and examine the other parts of the contract, we find further confirmation of the "requirements" construction. Nowhere in the contract except in clause second (a), which is the clause we quoted, is the quantity of 200,000 tons mentioned or referred to. Wherever the quantity of coal is referred to, the word "requirements" is used.

Subsection (c) of section second is as follows: "(c) The coal corporation agrees that all coal sales made by it to third persons shall be made subordinate to and dependent upon the said delivery to the aklali works of its average monthly coal requirements."

Here we not only have the "requirements" of the alkali works referred to as the subject matter of the contract, but even more significantly, the delivery of those requirements is referred to as "the said delivery." The reference here by the word "said" is necessarily to subsection (a), which we quoted at the beginning. Yet if the construction contended for by complainant is correct, the contract at this point [subsection (c)] should read: "The said delivery to the alkali works of approximately 200,000 tons of coal per annum," which is precisely what it does not say.

In subsection (e) of the same section of the contract it is provided that if the coal corporation, for any cause

not exempted, fails "for seven (7) or more consecutive days so to deliver to the alkali works its average daily coal requirement, then the alkali works shall have the absolute right to purchase the coal required by it upon the open market," etc. In subsection (f) of the same section it is provided that "if the coal corporation's failure so to deliver the said average daily coal requirements of the alkali works continues for a period of thirty (30) days  *  *  in this event the alkali works shall be entitled during the remainder of the term of this contract to receive its said requirements of coal at cost of production to be determined as hereinbefore provided." In subsection (c) of section third it is provided that "in case the coal corporation has failed to deliver the average daily coal requirements of the alkali works as herein provided for a period of thirty (30) days  *  *  *  in such event the alkali works shall have the right," etc.

Counsel for the coal company have argued with great force, ability and ingenuity that certain subsections of section second of the contract (c) (d) (e) and (f) are inconsistent with a "requirements" contract. Whether all these provisions are workable in a "requirements" contract or not is not entirely clear, but they are certainly subordinate to the primary object of the instrument, the object which brought it into being, and which is so clearly expressed that to construe the language used in any other way than we have construed it would be equivalent to making a new contract for the parties so far as the quantity of coal is concerned. Such a construction requires the deletion of the phrase "the annual requirement of coal of the alkali works" from the contract. If the parties had intended to make a tonnage contract they would themselves have left out this phrase and would have expressed the quantity clause

somewhat as follows: The alkali works agrees to buy and pay for, and the coal corporation agrees to sell and deliver f. o. b. cars at the mines for and during the term of ten years from April 1, 1918, until April 1, 1928, at the price hereinafter specified, approximately 200,000 tons of coal per annum, to be delivered in approximately equal monthly instalments.

We do not feel justified in deleting the "requirements" phrase, nor in ignoring the significance of the words "approximately" and "estimated" in connection with the tonnage of coal.

[9] While entertaining the views heretofore expressed as to the contract here being considered, we wish to emphasize the holding of the courts in reference to these "requirements" contracts that a wilful and arbitrary juggling of "requirements" of the purchaser will not be countenanced. A contract for requirements is not a contract for such quantity as the purchaser may see fit to order, but a contract for such quantity as is requisite to supply its reasonable wants. Execution in good faith is required of the purchaser, and the question of good faith in the execution of this contract is one which the commissioner will be required to answer upon evidence adduced before him on the merits. See *Brawley* v. *U. S., supra,* page 171 (24 L. Ed. 622); *Excelsior Wrapping Co.* v. *Messinger, supra; Dowd* v. *Hercules Powder Company,* 66 Colo. 302, 181 Pac. 767, 7 A. L. R. 493; *H. D. Williams, etc., Company* v. *Scofield* (C. C. A.), 115 Fed. 119; *Asahel Wheeler Co.* v. *Mendleson,* 180 App. Div. 9, 167 N. Y. Supp. 435; *New York, etc., Iron Works Co.* v. *United States Radiator Co.,* 174 N. Y. 331, 66 N. E. 967. There are numerous other cases heretofore cited upon other points which stress the question of good faith on the part of the seller and the purchaser, which clearly show that the courts are zealous to guard

against any injustice or inequality which might arise out of such contracts. This is accomplished, not by defeating the contracts entirely, but by restricting the word "requirements" within its proper and equitable limits.

[10] Our conclusions, therefore, are, that while parol evidence cannot be introduced, the effect of which would be to strike out the phrase "annual requirements" and the word "estimated," it may be introduced on the merits to show what the *bona fide* "annual requirements" of the alkali works were.

[11] As to the quality of the coal contracted for, it is not claimed that there is any ambiguity in the contract. The contract says: "The said two grades of coal shall be of such quality as is required, as of this date, by the United States Government for coal supplied the Soldiers' Home at Johnson City, Tennessee, and shown upon the specifications hereto attached, marked 'specifications.'" The only difficulty presented here is whether the "specifications," which for some reason were not attached to the contract, have been identified by the evidence. The "specifications" referred to in the contract not being attached, it was competent, of course, to introduce parol evidence to identify such specifications if this could be done. The coal corporation offered testimony with respect to the quality of coal which the Soldiers' Home accepted from the mines from time to time; testimony as to the relative merits of coal used by the Soldiers' Home from various mines as compared with coal which it obtained from the coal corporation; and testimony as to the practice followed by the Soldiers' Home in calling for bids of coal used by it.

The alkali works offered testimony in which it undertook to specifically identify the specifications referred to in the contract.

The trial court in its decree, upon the question of quality, held as follows: "The quality of the coal to be delivered and taken under said contract was such as was required by the United States Government on September 1, 1917, for the coal supplied the Soldiers' Home at Johnson City, Tennessee, but as appears from the evidence no 'specifications' showing any particular chemical content having been agreed upon and attached to the contract, said quality will be determined by such requirement as the Government had in force and under which coal for the Soldiers' Home was purchased at that date, which are shown on printed forms of the Government, filed in the record with the deposition of Capt. F. H. Bailey, marked 'Specifications for Purchase of Bituminous Coal for National Home for Disabled Volunteer Soldiers,' dated May 4, 1917."

The contract itself refers to "attached" specifications as to quality. When the contract was produced in evidence such specifications were not attached to it. The coal corporation takes the position that in the absence of such specifications the standard of quality under this contract is to be determined by such coal as the Soldiers' Home accepted and used from time to time.

The position of the alkali works is that it is entitled to identify the specifications which the parties actually agreed upon as fixing the standard of quality; that the quality must conform to such specifications, and that extrinsic evidence of any other standard is inadmissible.

If the specifications had remained attached to the contract, and were so attached when it was produced in evidence, no question could arise as to what the terms of the contract were.

If the specifications so attached were unambiguous,

it is equally clear that the parol evidence rule would exclude any proof with respect to the requirements as to quality, and that the parties must be bound by the terms of the specifications.

If the specifications were originally attached to the contract, but had been separated from it, the situation is in no respect changed, providing that the original of the specifications can be identified. In such case the specifications constitute an agreement. Proof of the agreement would consist merely of the identification of the document.

Nor is the situation changed in any respect, in the event that the specifications were never attached.

[12] "Where a written instrument contains a reference to some other writing, parol evidence is admissible for the purpose of identifying the writing so referred to." 22 C. J. page 1181. See also 22 C. J., 1156-1157, #1552, and 22 C. J., 1211, #1614. *Morgan* v. *Spangler*, 14 Ohio St., 103, 115.

With reference to the specifications referred to in the clause fixing the quality of the coal to be delivered under the contract, it is only necessary to say that the evidence conclusively identifies the document printed in the present record on pages 297 and 298 as the United States specifications for coal to be delivered at the Soldiers' Home at Johnson City, Tennessee, in force at the home at the time the contract here being considered was entered into and that these were the specifications intended to be attached to the contract. It follows, of course, that these specifications fix the standard of coal to be delivered under that contract. It further follows that all parol evidence as to the quality of the coal to be delivered (since the specifications referred to in the contract have been definitely identified) was inadmissible and should be disregarded.

[13] So far as the price of the coal agreed upon, the contract is without ambiguity. There is none claimed or alleged. No parol evidence was necessary or competent to explain the price clause or assist in its construction.

The trial court upon this branch of the case, however, decreed as follows: (3) The price to be paid by the Mathieson Alkali Works under said contract for the coal to be supplied by the coal corporation was cost of production plus a profit of twenty-five cents per ton, subject to such subsequent agreement as to additional profit per ton as complainant may be able to establish, but not subject to the limitation as to cost of production mentioned in the contract of September 1, 1917, if it shall appear as the evidence thus far indicates that said limitation or standard was rendered impossible of performance by virtue of the default of the Mathieson Alkali Works in taking said tonnage per year mentioned above, and in the manner provided by said contract.

[14] This finding of the court, first, as to the holding that the price agreed upon in the contract of September 1, 1917, was subject to any subsequent agreement as to additional profit per ton, which the coal company may be able to establish, no doubt grew out of an alleged supplemental agreement as to additional profits set up in the first amended bill, which was, however, in effect withdrawn later, and the same claim in different form, partaking of the nature of a claim for damages arising out of tort, was set up in a second amended bill. This change of position followed a demurrer to the first amended bill. The second amended bill was demurred to and in our judgment this demurrer should have been sustained, since to allow this claim for damages arising out of an alleged

tort to be injected into a suit for damages for breach of contract, would in effect permit the changing of one section of complainant's cause of action from contract to tort. This cannot be permitted, especially after complainant had previously alleged a supplemental contract as to additional profits.

[15] In the present state of the pleadings, therefore, it was error to decree that the price fixed by the contract of September 1, 1917, was subject to such subsequent agreement as to additional profits as the complainants may be able to establish. It is further clear that this was error because, as heretofore indicated, in the second amended bill, the complainant was claiming damages for a tort, and not for additional profits by virtue of a supplemental contract.

Stated succinctly, we think that at no stage of the proceedings did complainant allege facts sufficient to constitute a cause of action upon any agreement subsequent to the contract of September 1, 1917. This it practically conceded when it filed its second amended bill and attempted to assert a cause of action based upon tort. The overruling of the demurrer of the alkali works permits the complainant to change the original proceedings, sounding in contract, to a proceeding sounding, upon one phase thereof, in contract and upon another in tort. The authorities, under such circumstances, do not permit the assumption of such inconsistent positions. 10 R. C. L. pages 968, 969. Lile's Equity Pleading & Practice, section 123; *New River, etc., Co.* v. *Painter,* 100 Va. 507, 42 S. E. 300; *Bowman* v. *First National Bank,* 115 Va. 463, 80 S. E. 95; *Irvine* v. *Barrett,* 119 Va. 587, 89 S. E. 904, Ann. Cas. 1917C, 62; Burk's Pleading & Practice, 586. See also *Inman* v. *Seaboard Air Line Railway Company,* 159 Fed. 960, a case very closely in

point. As is also *Hass Bros.* v. *Hamburg Bremen Fire Ins. Co.,* 181 Fed. 916.

The finding of the trial court that the price agreed upon by the contract of September 1, 1917, was "not subject to the limitation as to cost of production mentioned in the contract if it shall appear   *   *   * that the limitation or standard was rendered impossible by default of the alkali works," no doubt resulted from the conclusion the court reached that the contract was a tonnage contract. Our holding that the contract is a "requirements" contract removes any such question as this from the present consideration of the court. We think the holding was premature, even in the view the trial court took of the contract. No such question was before the court. All questions of breach of the contract or any part of it by either of the parties litigant will arise on the merits, and should not be considered upon the question of construction of the contract.

We are of opinion, therefore: First That the clause of the contract relating to the quantity of coal contracted for is unambiguous, and that parol evidence is unnecessary and incompetent to explain it. *Brawley* v. *United States, supra.* That the only effect of parol evidence to be of any value to the complainant would be to strike out or render meaningless the phrase "annual requirements" which if permitted would result in alteration of the meaning of the contract, contrary to the parol evidence rule. That the quantity clause is a "requirements" clause, and not a tonnage clause. Second: The quality clause is unambiguous in its term, but the specifications referred to therein as attached thereto not being as a matter of fact attached, that parol evidence was competent to identify these specifications, but for no other purpose, and that the

specifications were definitely identified by the evidence.

Third: That the price clause is unambiguous and should have been construed, at this time, with the pleadings in the form in which they now are, without any reference to an alleged subsequent agreement as to additional profits, and without any reference as to a breach of any part of the contract by either party to it. That the question of a breach of the contract, if any there was by either party to it, and the damages if any either party may be entitled to, are questions upon the merits which should be referred to the commissioner to report upon.

We are of opinion, therefore, to reverse the decree complained of, to enter a decree embodying the conclusions herein expressed, and to remand the cause to the circuit court to be further proceeded with as indicated herein.

*Reversed and remanded.*