# Staunton

## Portsmouth Gas Co. v. Martin Shebar, Et. Al.,

September 6, 1968.

Record No. 6737.

Present, All the Justices.

*Harry E. McCoy* (*Seawell, McCoy, Winston & Dalton; Cooper, Spong & Davis*, on brief), for plaintiff in error.

*H. Lee Kanter* (*Robert E. Brown; Kanter & Kanter*, on brief), for defendants in error.

Gordon, J., delivered the opinion of the court.

We must decide on this appeal whether the trial court erred in setting aside a jury verdict for the defendant, Portsmouth Gas Company, and entering judgment for the plaintiffs, Martin Shebar and others.

The plaintiffs brought this action against the Gas Company, alleging that under a contract dated April 26, 1963 the Gas Company had agreed to sell them chilled water piping as part of the air conditioning system for an apartment project. They asserted that the Gas

Company had sold unsuitable piping, thereby breaching its express and implied warranties under the Contract and asked for damages in the amount of $100,000.

The Gas Company admitted that under the Contract it had agreed to sell certain heating and air conditioning equipment to the plaintiffs. The Gas Company denied, however, that it had agreed to sell, or had sold, chilled water piping to the plaintiffs, asserting that the plaintiffs had bought the piping through an independent contractor who was not the Gas Company's agent.

The crucial question before the trial court was whether the heating and air conditioning equipment agreed to be sold under the Contract included the chilled water piping. The answer to that question depended upon a proper construction of the Contract, which reads:

"THIS AGREEMENT, Made this 26th day of April, 1963, by and between PORTSMOUTH GAS COMPANY, a public service corporation, of Portsmouth, Virginia, party of the first part, hereinafter called the 'Seller', and MARTIN SHEBAR, IRVIN H. COHEN, SIDNEY W. COREN, JOSEPH J. GARNER, and H. LEE KANTER [the plaintiffs in this action], parties of the second part, hereinafter called the 'Buyers';

"WITNESSETH: That for and in consideration of the sum of Sixty-five thousand, two hundred seventy-two dollars and sixty-five cents ($65,272.65), to be paid by the buyers in the following manner, namely, Sixty-five hundred and twenty-seven dollars and twenty-six cents ($6,527.26) at and before the signing and sealing of this agreement, receipt of which is hereby acknowledged, and the balance of Fifty-eight thousand, seven hundred and forty-five dollars and thirty-nine cents ($58,745.39), including interest, to be paid in installments of Three thousand seven hundred and four dollars and twenty-two cents ($3,704.22), the first payment to become due six months after date, and then quarterly until paid, the seller doth hereby bargain, sell and deliver to the buyers the following goods and chattels, to-wit:

"1. Gas air conditioning and heating equipment:
    (a)  15 model 54-450 Bryant Gas Chillers, 4.5 tons each.
    (b)  3 model 36-450 Bryant Gas Chillers, 3 tons each.
    (c)  51 thermostat kits with 2 speed relays.
    (d)  51 model 18-407 cooling coils.
    (e)  51 model 54904C06 coil housings.
    (f)  51 model 50-393-E counterflow furnaces, or the equivalent.

(g)  18 model 5413D part load controls.

(h)  18 model 675A1003 outdoor thermostats.

2.  51 Norge gas refrigerators, model 721-880, 11 cu. ft. double door.

3.  51 Caloric model S351-KX-T ranges with 51 model 943 hoods; 51 model 21 x 32 double sinks, and 51 model SP-30 splash plates.

4.  51 Caloric caddies.

5.  1 Bryant 75-335 unit heater, installed in laundry room.

6.  1 Ruud model GL82-200 gas water heater for laundry room, but not to be installed.

"*Seller will finance installation of heating and air conditioning equipment, which includes chilled water piping, gas piping and duct work, not including electrical work.* [Emphasis supplied.]

"Seller covenants and agrees with buyers, that the goods and chattels are of good merchantable quality, and further will warrant title to said goods and chattels to buyers, free from the claims of all persons whatsoever.

"Save as aforesaid, however, the buyers agree to execute a chattel mortgage to Clyde W. Cooper, Trustee, to secure the balance of the purchase price of Fifty-eight thousand, seven hundred and forty-five dollars and thirty-nine cents ($58,745.39), as hereinabove set forth, evidenced by a note in the same amount, bearing same date, and payable in the manner hereinabove prescribed. [Testimonium and signatures follow.]"

The Gas Company contended that the heating and air conditioning equipment to be sold under the Contract comprised only those items listed in clause 1. The words of the Contract, "the seller doth hereby bargain, sell and deliver to the buyers the following goods and chattels", immediately precede lists of specific items to be sold. Neither the list in clause 1 ("Gas air conditioning and heating equipment") nor the lists in clauses 2 through 6 (other equipment) include chilled water piping.

On the other hand, the plaintiffs contended that the lists of equipment in clauses 1 through 6 do not purport to include all the equipment agreed to be sold under the Contract. They relied upon the succeeding paragraph of the Contract, which reads: "Seller will finance installation of *heating and air conditioning equipment, which includes chilled water piping*, gas piping and duct work. . .". (Emphasis supplied.) The plaintiffs argued that this paragraph evidences

the parties' intention to include chilled water piping as part of the "Gas air conditioning and heating equipment" agreed to be sold under clause 1 of the Contract.

Conversely, the Gas Company argued that the words "which includes chilled water piping, gas piping and duct work" were included in this paragraph only to describe particular items of equipment the Gas Company would *finance.*

Based on their respective contentions, the plaintiffs and the Gas Company each moved for summary judgment. The court overruled both motions, holding the Contract was ambiguous and parol evidence should be admitted to determine the Gas Company's responsibility for the chilled water piping.

█ The Gas Company assigned error to the overruling of its motion for summary judgment and to the admission of parol evidence to explain the meaning of the Contract. Although the Contract evidenced a meeting of the minds respecting the sale and purchase of certain heating and air conditioning equipment, we agree with the trial court that the Contract was ambiguous as to what items of equipment the Gas Company committed itself to sell. So evidence of the conduct of the parties, the surrounding circumstances and declarations of intent relating to the Contract was admissible to resolve this latent ambiguity. *See Greater Richmond Civic Recreation, Inc.* v. *A. H. Ewing's Sons, Inc.,* 200 Va. 593, 106 S.E.2d 595 (1959); 9 *Wigmore, Evidence* § 2472 (3d ed. 1940).[1]

Much of the evidence that was introduced in the trial court, and much of the argument there and here, related to the question whether the Gas Company agreed to install the chilled water piping and whether the plumber who installed the piping did so as agent for the Company. But since the plaintiffs did not allege or attempt to prove faulty installation of the piping, evidence that the plumber installed the piping as the Gas Company's agent was relevant only insofar as it tended to show that the plumber purchased, as well as installed, the piping as the Gas Company's agent.

---

[1] Under the rule adhered to in Virginia, "extrinsic evidence is not admissible to determine the sense in which language is used unless the contract is ambiguous". *Mathieson Alkili Works* v. *Virginia Banner Coal Corp.,* 147 Va. 125, 136, 136 S.E. 673, 677 (1927). According to the Virginia Comment to section 2-202 of the Uniform Commercial Code, that section "reflects a more liberal approach to the introduction of parol evidence to explain or supplement written contracts for the sale of goods than has been followed in Virginia". Va. Code Ann. § 8.2-202 (added vol. 1965). The Uniform Commercial Code is not applicable to this case because the contract was made before January 1, 1966. Va. Code Ann. § 8.10-101 (added vol. 1965).

Because the jury returned a verdict for the Gas Company, we will state the evidence in the light most favorable to the Company.

In early 1962 Martin Shebar formed Patio Plaza, Incorporated, of which he was the sole stockholder, to buy land in a redevelopment area in Portsmouth and to erect thereon apartments to be known as the Patio Plaza Apartments. In September 1962 a salesman for Portsmouth Gas Company made two written proposals to Shebar, as president of Patio Plaza, Incorporated, each proposal relating to gas air conditioning and heating equipment for the apartments.

Under the first proposal the Gas Company would "furnish" certain enumerated items of air conditioning and heating equipment[2] for the Patio Plaza Apartments at a specified price. This proposal then recited: "The estimated cost of installation of the aforementioned equipment will be $287.00 per apartment, this being the price quoted by *Irving Spindel Plumbing & Heating Contractor with whom you have contracted to install said equipment.* It is further agreed that in no case shall the installation cost exceed more than [*sic*] $300.00 per apartment." (Emphasis supplied.)

Under the second proposal the Gas Company would "finance the gas equipment. . . [to be furnished by it, including] air conditioning and heating equipment, refrigerators and ranges plus the cost of installation of the equipment, said installation to be performed by Irving Spindel, Plumbing & Heating contractor".

Later in September 1962 Shebar and his counsel met with officers of the Gas Company and its counsel to discuss the proposals, after which counsel for the Gas Company drafted a proposed agreement between the Gas Company and Patio Plaza, Incorporated.

The agreement provided: "[T]he Gas Company hereby agrees to finance *and* install the gas equipment for utilities and appliances in said apartments, which shall include air conditioning and heating equipment, refrigerators and ranges, plus the cost of installation of this equipment; said installation to be performed by Irving Spindel, Plumbing and Heating Contractor". (Emphasis supplied.) It then listed the air conditioning and heating equipment the Gas Company agreed to "furnish".[3] The agreement provided further that the cost of installing the equipment would not exceed $300 per apartment.

[2]The enumerated items are substantially the same as those listed in clause 1 of the April 26, 1963 Contract (*supra*, pp. 251-52).

[3]The heating and air conditioning equipment listed in the proposed agreement is substantially the same as that listed in clause 1 of the April 26, 1963 Contract (*supra*, pp. 251-52).

When counsel for the Gas Company mailed this proposed agreement to his client and counsel for Shebar, he advised that it was "subject to any modification and changes that may be suggested". Moreover, neither Shebar nor the Gas Company accepted this agreement. Shebar made a notation that it was void, and an officer of the Gas Company characterized it as merely a "rough draft" which was never signed.

In October 1962 Shebar conferred with an officer of the Gas Company and its counsel about the proposed agreement. The officer testified that at this conference he refused to accede to Shebar's request that the Gas Company agree to install the heating and air conditioning equipment.

In November 1962 an insurance company, which was considering a construction loan to Patio Plaza, Incorporated, requested Shebar to furnish information with respect to the proposed heating and air conditioning system for the apartment project. At Shebar's request the Gas Company wrote to the insurance company, listing the heating and air conditioning equipment[4] (and other equipment) to be furnished by the Gas Company to Patio Plaza, Incorporated. The letter then recited: "The Portsmouth Gas Company will also finance the cost of installation of the aforementioned equipment and this work will be done by Irving Spindel, Plumbing & Heating Contractor . . .". Like the proposed agreement drafted in September 1962, the letter made no reference to chilled water piping.[5]

Shebar was unable to raise sufficient capital to enable Patio Plaza, Incorporated to erect the apartments, so he asked other persons to invest capital in the undertaking. In 1963 Shebar and other investors, Irvin H. Cohen, Sidney W. Coren, Joseph J. Garner and H. Lee Kanter, formed a partnership to acquire the land from Patio Plaza, Incorporated and to erect the apartments. These partners and the

---

[4]The heating and air conditioning equipment listed in the letter is virtually identical to that listed in clause 1 of the April 26, 1963 Contract (*supra*, pp. 251-52).

[5]The September 1962 proposed agreement, which contemplated 50 apartment units, fixed the purchase price of the equipment at $47,257.50 and the installation costs at $14,350 ($287 per apartment), or a total of $61,607.50. The letter to the insurance company, which contemplated 51 apartment units, fixed the purchase price of the equipment at $49,997.85 and the installation costs at $14,637 ($287 per apartment), or a total of $64,634.85. The April 26, 1963 Contract, which also contemplated 51 apartment units, specified only a total amount of $65,272.65. The increase in the amount fixed in the April 26, 1963 Contract over that fixed in the letter to the insurance company apparently represents the cost of the items listed in clauses 5 and 6 of the Contract, which were not listed in the letter.

Gas Company subsequently entered into the Contract (set forth *supra*, pp. 251-52) upon which this action was brought.

As contemplated by the Contract, the plaintiffs signed and delivered a note for $58,745.39,[6] payable to the order of the Gas Company, and a chattel mortgage, conveying the equipment described in clauses 1 through 6 of the Contract, as security for the note. The chattel mortgage recited that the equipment was located on certain real estate on which the plaintiffs proposed to erect 51 apartments (the Patio Plaza Apartments) and was "to be installed therein, in accordance with a Bill of Sale bearing even date [the April 26, 1963 Contract]...".

After the Contract was signed, Irving Spindel ordered the chilled water piping and installed it in the Patio Plaza Apartments. Although Spindel testified that he acted as agent for the Gas Company, it refused to pay his first bills for "duct work" "material" and "labor" because they were addressed to the Gas Company and had not been approved by Shebar.[7] Spindel then submitted substitute bills addressed to Patio Plaza Apartments and bearing Shebar's approval, which the Gas Company paid. Spindel's subsequent bills for installation costs and materials, including "air conditioning piping", were addressed to Patio Plaza Apartments and approved by Shebar before the Gas Company paid them.

At the conclusion of the evidence the court overruled both parties' renewed motions for summary judgment, and submitted the case to the jury. Over the Gas Company's objection, the court instructed the jury that in determining what equipment the Gas Company agreed to furnish the plaintiffs, the jury might consider evidence of (1) the negotiations before the signing of the Contract, (2) the prior writings expressing the parties' intent, even though unsigned, (3) the surrounding circumstances, (4) the oral representations made by the Gas Company through its agents, and (5) the Gas Company's actions in performing the Contract. The court also instructed the jury that no contractual relationship could arise from negotiations until the minds of the parties were fully met and both parties intended to be bound.[8]

---

[6]The total amount payable by the plaintiffs to the Gas Company under the Contract was $65,272.65 (see note 5, *supra*), of which $6,527.26 was paid when the Contract was signed and the balance was represented by the note referred to in the text.

[7]Although the first bills submitted by Spindel were not identified by the testimony, the exhibits show they were three bills dated June 28, 1963.

[8]The court further instructed the jury, over the Gas Company's objection, that

The jury returned a verdict for the defendant Gas Company. Nevertheless, the judge set aside the verdict and entered final judgment for the plaintiffs,[9] holding he had committed error in submitting the case to the jury because the uncontradicted evidence showed the Gas Company "undertook the employment of Spindel". He based that holding on his findings that the Gas Company originally agreed to install the equipment and that, even though the parties subsequently agreed to modifications relating to the "make and quantity" of the equipment, the Gas Company "at no time objected to the original agreement to install". [10] Further, he pointed out that under the April 26, 1963 Contract the plaintiffs agreed to pay to the Gas Company "what they had agreed to pay all along which was the cost of the equipment being sold by the Gas Company, plus the cost of installation".

We do not agree that the evidence required those findings or that conclusion. The jury could have reasonably made the following findings from the evidence:

(1) Even if the proposed agreement drafted by the Gas Company's counsel in September 1962 would have committed the Gas Company to furnish chilled water piping and other installation equipment, that proposed agreement was never approved by either party. Shebar made a notation that the proposed agreement was void, and an officer of the Gas Company regarded it as merely a rough draft. When the parties renegotiated the terms in October 1962, they reached no agreement with respect to installation of the equipment. Agreement in that respect was first reached when the April 26, 1963 Contract was made, and that Contract committed the Gas Company not to install the equipment, but to finance its installation.

(2) The Gas Company's letter to the insurance company in November 1962 evidenced its willingness to sell only certain items of equipment, which did not include chilled water piping, and its understanding that Spindel would install the equipment.

---

the Gas Company breached its warranty of fitness if it "undertook" to install the air conditioning system through Spindel and, in such case, the jury should return a verdict for the plaintiffs. This instruction was incorrect because the issue was whether the Gas Company sold the unsuitable chilled water piping, not whether it installed the piping (see p. 253, *supra*). The error was harmless, however, because the jury returned a verdict for the Gas Company.

[9]Counsel having stipulated that the plaintiffs' damages were $27,132.11, the court entered judgment in that amount.

[10]By the words "the original agreement to install" the judge intended to refer to the proposed agreement drafted in September 1962 described *supra*, pp. 254-55.

(3) During the negotiations that led to the April 26, 1963 Contract, the Gas Company had no obligation to point out its objections to any previous proposals because the parties had not agreed to any previous proposal.

(4) The fact that the plaintiffs agreed under the Contract to pay to the Gas Company the total cost of all heating and air conditioning equipment, plus the cost of its installation, does not contradict the Gas Company's construction of the Contract. If, as contended by the Gas Company, the Contract committed it to sell only certain items of equipment and to finance the cost of chilled water piping and other installation equipment, the Gas Company would reasonably have insisted upon repayment of the amount advanced for installation equipment, as well as upon payment for the equipment sold by it.

Moreover, the jury could have reasonably found that the Gas Company's action in insisting that Spindel's bills for installation costs and materials be addressed to Patio Plaza Apartments and approved by Shebar, together with Shebar's acquiescence in that action, supported the Gas Company's position that Spindel bought the piping as agent for the plaintiffs and that the Gas Company had agreed only to finance this equipment.

Based on those findings, the jury could have properly determined that the Gas Company did not breach any express or implied warranty under the Contract because it had not agreed to sell, and had not sold, the chilled water piping to the plaintiffs. It was the province of the jury to make that determination: "Where . . . the meaning of a writing is uncertain or ambiguous and parol evidence is introduced in aid of its interpretation, the question of its meaning should be left to the jury". 4 *Williston, Contracts* § 616, at 652 (3d ed. 1961); *see Greater Richmond Civic Recreation, Inc.* v. *A. H. Ewing's Sons, Inc.,* 200 Va. 593, 106 S.E.2d 595 (1959). Therefore, we reinstate the jury verdict and enter final judgment for Portsmouth Gas Company.

*Reversed and final judgment.*