LUEDTKE ENGINEERING
COMPANY, Plaintiff,

v.

INDIANA LIMESTONE COMPANY,
INC., Defendant.

No. NA 80–165–C.

United States District Court,
S.D. Indiana,
New Albany Division.

Aug. 9, 1983.

Hillyer & Irwin by Peter J. Ippolito, San Diego, Cal., Ice, Miller, Donadio & Ryan by John F. Prescott, Indianapolis, Ind., for plaintiff.

Barnes & Thornburg by Michael R. Fruehwald, Indianapolis, Ind., for defendant.

## MEMORANDUM OF DECISION

NOLAND, Chief Judge.

In this breach of contract action the amount in dispute exceeds $10,000 and there is diversity of citizenship, therefore, the Court has jurisdiction as stipulated by the parties, under 28 U.S.C. § 1332.

The plaintiff is Luedtke Engineering Company, Inc. (hereinafter referred to as "Luedtke"). Luedtke is a corporation organized under the laws of the State of Michigan having its principal place of business in Frankfort, Michigan. It is engaged in the business of marine construction. Luedtke primarily works in the Great Lakes area.

The defendant is Indiana Limestone Company, Inc. (hereinafter referred to as "Indiana Limestone"). It is a corporation organized under the laws of the State of Indiana having its principal place of business in Bedford, Indiana. Indiana Limestone is engaged in the business of quarrying and selling block and cut limestone.

Prior to the present transaction, which gives rise to this lawsuit, Luedtke and Indiana Limestone have done business together for a number of years. With respect to at least five other projects the business relationship between the two parties, although not completely harmonious, has been satisfactory. This is the first instance where the parties have turned to the court to settle a contract dispute.

The plaintiff, Luedtke, claims that defendant, Indiana Limestone, breached a contract which called for Indiana Limestone to make timely delivery of a certain kind of limestone, commonly known as "Breakwater" stone, "A" stone, or "Armor" stone. It is necessary to set forth the facts of the case before the Court can analyze the legal issues regarding the alleged breach of contract.

In either December of 1977 or January of 1978, the Chicago District Army Corps of Engineers (hereinafter referred to as "Corps of Engineers") solicited bids from general marine contractors for the repair of a breakwater in the Milwaukee Harbor, Milwaukee, Wisconsin. Luedtke was one of the contractors solicited.

A breakwater barrier is an enlongated mound, covered with rocks of various sizes, that runs somewhat parallel to the shore. Its function is to protect the navigable waterway between the shore and barrier from the turbulent waters of Lake Michigan. To repair the Milwaukee Harbor breakwater, the named contractor would have to strategically place various amounts of stone, in three different sizes, on the existing mound, also known as a rubble mound. First, the contractor would have to spread a thin layer of stone called "C" stone on the submerged foundation of the rubble mound. Next, the "C" stone had to be covered with a larger sized stone known as "B" stone. Finally, the "B" stone would be covered with the largest sized stone, "A" stone. This "A" stone or "Breakwater" stone would become the exterior skin of the rubble mound. Not only would the "Breakwater" stone be placed on the rubble mound below the water surface, but it would be piled on the mound in such a manner that it would extend some distance above the surface of the water. Thereafter, it would be a barrier between the main body of the lake and the harbor.

Each category of stone, mentioned above, had to meet the Corps of Engineers' specifications as set forth in their solicitation (*i.e.,* weight, dimensions, absorption rate, etc.). In this action the Court is only concerned with the "A" stone. This is the grade of stone that Luedtke contracted to buy from Indiana Limestone and its alleged untimely delivery is the basis of this lawsuit.

"A" stone is a generic term for a large, heavy, limestone which, as previously stated, is principally used as the outer layer, the exterior, of breakwater barriers. It is essentially a by-product of the commercial quality stone quarry operations. The Corps of Engineers required that the "A" stone to be used for the Milwaukee Project range in weight from 10 to 20 tons, with 75 percent of the "A" stone to be over 14 tons in weight. The stone was to be such that the greatest dimension should not exceed three times the least dimension. An estimated 70,000 tons of "A" stone would be needed for this project. In addition to specifying the dimensions of the "A" stone, the Corps of Engineers also restricted the sources for which the general contractor could obtain the stone. At the onset of the

project, the Corps of Engineers approved only two sources from which the general contractor could purchase "A" stone. The "approved" sources were the Victor Oolitic Stone Company, Bloomington, Indiana and the Indiana Limestone Company quarries, with headquarters in Bedford, Indiana.

In the summer of 1977, Indiana Limestone was informed by the Corps of Engineers about the prospective Milwaukee Harbor Project. The Corps of Engineers called upon Indiana Limestone to assist them in preparing the budget for the project. At that time, Indiana Limestone knew that the Corps of Engineers contemplated that the general contractor would work during the period of March 15 to October 15, 1978, would not work during the period October 15, 1978 to March 14, 1979, and would complete work between March 15, 1979 and November 15, 1979. Although the Corps of Engineers had scheduled a time period during the winter where no work was to be done, the solicitation would allow a contractor to work during this period provided he obtained approval from the Corps of Engineers.

The Corps of Engineers provided Indiana Limestone with a list of general contractors who would be bidding on the Milwaukee Harbor Project. Luedtke received a letter, dated February 20, 1978, from Indiana Limestone which was a quotation to supply Luedtke with the 70,000 tons of type "A" breakwater stone at "$10.25 per net ton, F.O.B. cars our quarries, Lawrence and Monroe Counties, Indiana." The quote also stated that the "price of stone [would] be valid for shipments during the years 1978 and 1979".

Luedtke used Indiana Limestone's offer to formulate its overall bid to the Corps of Engineers. Subsequently, on April 12, 1978, the Milwaukee Harbor Project contract was awarded to Luedtke. They were to repair the existing breakwater barrier for $2,331,600.

Between the time that the contract was awarded to Luedtke and the time that work on the project was to commence, Luedtke made efforts to secure "A" stone from other quarries at a price lower than Indiana Limestone's bid. Luedtke was able to locate "A" stone in sufficient quantity at a rate of $5.25 a ton. This stone was located at a quarry that was not approved by the Corps of Engineers. Several attempts were made by Luedtke to persuade the Corps of Engineers to approve this quarry. In the meantime, Indiana Limestone learned that Luedtke was in the process of trying to obtain permission from the Corps of Engineers to use "A" stone from an unapproved quarry. In an effort to secure Luedtke's business, Indiana Limestone lowered the price of their "A" stone to $5.50 a ton. This oral modification of the offer was made by phone on June 13, 1978. On the same day, Luedtke was informed by the Corps of Engineers' contracting officer that they were officially denying Luedtke's request to use "A" stone from any non-approved source. As a consequence of these events Luedtke issued a purchase order on July 1, 1978, to Indiana Limestone for the breakwater stone.

The purchase order was for "approximately 70,000 tons of type 'A' breakwater stone at a price of $5.50 per ton F.O.B. loaded into rail cars at quarry." The purchase order also stated "ship at 1500 Tons/day starting 24 July 1978." Luedtke's shipping rate contemplated a completion date for the delivery of the 70,000 tons of stone by November of 1978. This completion date was apparently planned in spite of the fact that the Corps of Engineers' contract allowed Luedtke until November of 1979 to complete the project. Luedtke contended that its bid of $2,331,600 was based on completing the project in November of 1978.

Luedtke's intention to complete the project at the much earlier date was not clearly made to the Corps of Engineers or to Indiana Limestone. In fact, by letter dated June 6, 1978, the Corps of Engineers requested from Luedtke a "schedule of operations" for construction. Luedtke submitted a Construction Progress Chart dated June 19, 1978, in response to the request. The Construction Progress Chart

showed that placement of stone was scheduled to start August 1, 1978, and to continue until November 15, 1978, the commencement of a "No Work Period". Stone placement was to resume around June 15, 1979, and to be completed July 31, 1979. After a request from the Corps of Engineers for a revision of the chart, with respect to field office and project signs, Luedtke submitted a revised Construction Progress Chart dated July 6, 1978, again showing the same schedule for stone placement with completion July 31, 1979.

As to Indiana Limestone, the 1500 tons per day rate had never been discussed with anyone at Indiana Limestone before it was inserted in the Purchase Order. Prior conversations between Luedtke and Indiana Limestone regarding the shipping rate was casual in manner with no specific rate being agreed upon. In these prior conversations, Luedtke mentioned a shipping rate of 1700 tons per day and Indiana Limestone said that 1700 tons per day was out of the question, but thought that a 1200 tons per day rate might be possible. No rate was established between the parties before the purchase order was sent.

Not realizing the significance of the shipping rate of 1500 tons/day, Indiana Limestone proceeded to ship the "Breakwater" stone as it had in past transactions with Luedtke. Indiana Limestone believed that the shipping rate stated in the purchase order was intended to be a goal or maximum; that Indiana Limestone was to ship as many tons per day as reasonable. For a variety of reasons, the "Breakwater" stone was not shipped at a daily rate that at any time came close to the purchase order's stated rate of 1500 tons/day. In fact, the shipping rate was such that the last stone shipment from Indiana Limestone arrived at the job site on August 20, 1979. The Corps of Engineers accepted the work on the project essentially completed in mid-September by letter dated September 26, 1979. The job was finished seven weeks before the required completion date of November 15, 1979, but almost nine months later than Luedtke had anticipated.

Luedtke alleges that the delay in delivery of the type "A" breakwater stone prevented them from completing the project before the onset of the 1978–1979 winter season as planned. Luedtke claims damages in that they experienced equipment down time as a result of the infrequent and untimely deliveries of "A" stone in 1978. Furthermore, Luedtke claims as a result of the delay that they were required to maintain equipment, labor, supervisors and a presence at Milwaukee from January 1979 until the project was ultimately completed in September of 1979. Luedtke contends that Indiana's breach entitles them to damages of approximately $797,700.

During the course of the trial, much evidence was presented concerning Luedtke's efforts to expedite the delivery of "A" stone. Allegations were made by Luedtke that Indiana Limestone was dilatory and not acting in good faith in trying to meet the shipping rate. Indiana Limestone responded by submitting evidence that they did not realize the true meaning of the shipping rate terms on the purchase order. Indiana Limestone presented evidence that the reasons for the sporadic delivery was for causes beyond their control. Conflicting evidence was heard as to whether there was sufficient rail service to the quarries to meet the shipping rate. Evidence was presented that, at least for a short period of time, strikes by various unions had an adverse effect on the shipment. Indiana Limestone pointed out that the severe winter of 1978–1979 was a factor in failing to meet the alleged shipping rate.

The Court finds that the above evidence is relevant in the overall view of the transaction, and the Court further finds the evidence regarding the formation and interpretation of the contract to be controlling. Specifically, the Court finds that the central concern in this case is whether the terms of the Purchase Order relating to shipping rates became part of an agreement between these two parties. The Uniform Commercial Code (hereinafter referred to as "Code"), as enacted in Indiana, controls this Court in determining whether

a contract or agreement had been formed, and, if so, the interpretation to be given the terms of the contract. References to the Indiana Commercial Code and the Uniform Commercial Code are used interchangeably and are exact in every respect unless otherwise noted.

The Code expands the concept of contracts. Indiana Code 26–1–1–201(11) defines "contract" as "the total legal obligation which results from the parties' *agreement* as affected by this Act and any other applicable rules of law." (Emphasis added.) Furthermore, in the Code, "agreement", I.C. 26–1–1–201(3), "means the bargain of the parties in fact as found in their language *or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act*, I.C. 26–1–1–205 and 26–1–2–208)." (Emphasis added.) Thus, the Code supplies a sales agreement with much that is not made express by the parties. *See*, J. White & R. Summers, *Uniform Commercial Code*, Chapter 1, Section 1, 2nd Edition (1980).

■ The first issue to be resolved by the Court is determining whether a contract had been formed under the provisions of the Code. I.C. 26–1–2–102 states that "unless the context otherwise requires, this article applies to transactions in goods." This case deals with the sale of materials (stone) removed from the ground. I.C. 26–1–2–107 states in pertinent part that:

. . . . .

(1) A contract for the sale of timber, minerals or the like or a structure or its materials to be removed from realty is a contract for the sale of goods within this article if they are to be severed by the seller.

. . . . .

The stone purchased by Luedtke was severed from the realty by the seller, Indiana Limestone. *See Tousley-Bixler Constr. v. Colgate Enterprises*, Ind.App., 429 N.E.2d 979 (1982). Therefore, the provisions of the U.C.C., as adopted by Indiana, will apply.

■ Finding that there was a sale of goods the Court next turns to I.C. 26–1–2–206 to determine whether a contract had been formed. Luedtke was sent a quote by Indiana Limestone dated February 20, 1978. The quotation outlines the price, quantity and delivery terms, namely, F.O.B. the Indiana Limestone quarries located in Lawrence and Monroe Counties, Indiana. The Court acknowledges that the initial quotation price of $10.25 per ton was later modified to $5.50 per ton. This oral modification does not alter the fact that this was an offer by Indiana Limestone to Luedtke for the sale of type "A" breakwater stone. The acceptance of this "offer", as modified by the oral price reduction, occurred when Luedtke issued the Purchase Order to Indiana Limestone dated July 1, 1978. The terms of the Purchase Order did not change any of the terms of the offer, but added the specific delivery requirement of 1500 tons per day. The Court finds that the Purchase Order sent to Indiana Limestone constituted an acceptance of Indiana Limestone's offer.

I.C. 26–1–2–206 states in pertinent part that:

. . . . .

(1) Unless otherwise unambiguously indicated by the language or circumstances

(a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances;

. . . . .

Therefore, the Court holds that a contract or an agreement, as defined by I.C. 26–1–1 201(3) and (11), respectively, had been formed upon Indiana Limestone's receipt of Luedtke's Purchase Order. The Court finds that there is a contract in spite of the fact that the Purchase Order was not a "mirror image" of Indiana Limestone's offer.

■ At common law, "for an offer and an acceptance to constitute a contract, the acceptance must meet and correspond with the offer in every respect, neither falling within nor going beyond

the terms proposed, but exactly meeting [those terms] at all points and closing with them just as they stand." *Gates v. Petri* (1957), 127 Ind.App. 670, 143 N.E.2d 293, 297. An acceptance which varies the terms of the offer is considered a rejection and operates as a counter-offer, which may be accepted by the original offeror by performing without objection under the terms contained in the counter-offer.

■ § 2–207 [1] was specifically designed to alter the common-law "mirror-image" rule. Nordstrom, Handbook of the Law of Sales § 37 (1970). The drafters recognized that in commercial practice, especially with the advent of printed forms, the terms of the "offer" and "acceptance" were seldom the same. They further recognized that the parties to a commercial transaction seldom were aware of the conflicting terms and conditions contained in the printed forms they exchanged. § 2–207 was therefore designed to allow enforcement of an agreement despite discrepancies between offer and acceptance, if enforcement could be required without either party being bound to a material term to which he has not agreed. *American Parts Co., Inc. v. American Arbitration Ass'n.* (1967) 8 Mich.App. 156, 154 N.W.2d 5, 12.

*Uniroyal, Inc. v. Chambers Gasket & Mfg. Co.*, 177 Ind.App. 508, 380 N.E.2d 571, 575.

If a contract is recognized under sub-section (1), and it has been, the additional terms in the acceptance are treated as proposals for additions to the contract which, as between merchants, become part of the contract unless certain specified conditions render the proposals inoperative. I.C. 26–1–2–104, defining merchants, is as follows:

"Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

Therefore, the question, and central issue of this case, is whether the additional terms regarding the shipping date became part of the contract. Additional terms do become part of the contract, unless the additional terms "... materially alter it ...", I.C. 26–1–2–207(2)(b). "Material alteration is an addition or change to the contract which would result in surprise or hardship if incorporated without express awareness by the other party," *Coastal Industries, Inc. v. Automatic Steam Products Corp.*, 654 F.2d 375 (1981). "The question of material alteration necessarily rests on the facts of each case," *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1169 N. 8 (6th Cir.1972).

The U.C.C. does not define what constitutes material alteration, and although comments 4 and 5 of the Uniform Commercial Code's Section 2–207 provides examples of terms which will, and will not, materially alter a contract, a rate of shipment clause is listed under neither. However, Comment 4 does indicate that a clause is a material alteration of a contract if it is a clause that "would result in surprise or

---

1. I.C. 26–1–2–207 [19–2–207]. Additional terms in acceptance or confirmation. (1) A definite and reasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms. (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received. (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act [26–1–1–101—26–1–10–106.] Acts 1963, ch. 327, § 2–207, p. 539.

hardship if incorporated without the express awareness by the other party."

■ Whether the addition of the shipping term is a material alteration or not is a fact sensitive issue. The Court finds, from the evidence presented at the hearing, along with the parties' previously submitted briefs and affidavits, that the terms found in the Purchase order sent by Luedtke stating a shipping rate at 1500 tons per day constitutes additional terms to the contract that would materially alter it. Obviously, the addition of the shipping rate provision, resulting in a November 1978 completion date, was a significant requirement contrary to Indiana Limestone's understanding of the completion date as specified by the Corps of Engineers for November of 1979. This would have been contra to all that Indiana Limestone knew about the project. It would have been contra to what the Corps of Engineers knew about the project which they had planned.

A consideration of the totality of the evidence submitted leads this Court to the conclusion that neither party could have reasonably expected that a shipping rate of 1500 tons a day would be met. To expect such a rate, and to demand such a rate, would not only work a hardship on Indiana Limestone but was an impossibility as shown by the evidence presented. Although some of the evidence is conflicting as to the reasons for shipping delays, it is clear to the Court that neither of the parties had ever experienced a prompt and regular shipment rate from this particular quarry area. Such intervening factors as rail car unavailability, inclement weather, labor strikes, and the like, had always been accepted as factors which prevented strict compliance with a stated shipping rate. In addition, the Court finds that in prior dealings a specified shipping rate between the parties had never been clearly established or complied with. The evidence reveals that in prior dealings the desired shipment rates were often omitted from the Purchase Orders and then later supplied by subsequent phone calls or letters. It appears that the desired shipment rates on some projects changed several times during the course of the job. In essence, the stated rates were often ignored or modified.

As stated above, the agreement between Luedtke and Indiana Limestone does not contain a shipping rate due to the Court's interpretation and application of I.C. 26–1–2–207(2)(b). Thus, I.C. 26–1–1–205 which states in part:

26–1–1–205. Course of dealing and usage of trade. (1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. (2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court. (3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement. (4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade. (5) An applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance.

In *Parker v. Rod Johnson Farm Serv., Inc.,* 179 Ind.App. 190, 384 N.E.2d 1129, 1132, the Court holds that "under I.C. 1971, 26–1–1–205, a usage of trade may supple-

ment or qualify the terms of an agreement." The admissibility of extrinsic evidence used to explain and supplement this contract is permitted by application of I.C. 26–1–2–202, as discussed below.

■ The Court notes that even if it was to determine that the additional terms regarding the shipping rate was not a material alteration of the agreement and did, in fact, become part of the contract, course of dealing, usage of trade, and course of performance may be used to interpret the express terms of the agreement. In *Warrick Beverage Corp. v. Miller Brewing Co.*, 170 Ind.App. 114, 352 N.E.2d 496, the Court of Appeals dealt with the parol evidence rule as found in I.C. 26–1–2–202. The Code provides the permissible application of parol evidence.

26–1–2–202. Final written expression—Parol or extrinsic evidence.—Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented.

(a) by course of dealing or usage of trade (section [26–1]1–205) or by course of performance (section [26–1]2–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement. [Acts 1963, ch. 317, § 2–202, p. 539.]

The *Warrick* Court acknowledged that parol evidence, consisting of course of dealing and usage of trade, would be admissible not only in cases of ambiguity in a writing, but in all cases, unless the evidence to be presented contradicted the terms of the writing. In other words, the test for allowing the use of such evidence does not rest on whether the terms are clearly written into the contract, but whether the evidence is contradictory to those expressed terms.

A Fourth Circuit case which closely parallels the one this Court is addressing allowed evidence to be submitted showing course of dealing, usage of trade, and course of performance where the terms of the contract were unambiguous and complete on its fact. Although not controlling the case does appear to give the general interpretation of the U.C.C. as adopted in Indiana. Specifically, it relates to I.C. 26–1–2–202, *supra.*

In *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3 (4th Cir.1971), a buyer agreed to buy at least 31,000 tons of phosphate per year for three years from the seller. However, due to market changes, the buyer only ordered a fraction of the 31,000 ton minimum, and the seller sued for breach of contract. The District Court judge refused to admit parol evidence of course of dealing and usage of trade purportedly showing that the contract's price and quantity terms were mere projections to be adjusted according to market forces. The Fourth Circuit reversed and remanded stating the following:

■ A number of Virginia cases have held that extrinsic evidence may not be received to explain or supplement a written contract unless the court finds the writing is ambiguous. *E.g., Mathieson Alkali Works v. Virginia Banner Coal Corp.*, 147 Va. 125, 136 S.E. 673 (1927). This rule, however, has been changed by the Uniform Commercial Code which Virginia has adopted. The Code expressly states that it "shall be liberally construed and applied to promote its underlying purposes and policies," which include "the continued expansion of commercial practices through custom, usage and agreement of the parties * * *." Va. Code Ann. § 8.1–102 [2] (1965). The importance of usage of trade and course of dealing between the parties is shown by

2. See I.C. 26–1–1–202.

§ 8.2–202 [3] which authorizes their use to explain or supplement a contract. The official comment states this section rejects the old rule that evidence of course of dealing or usage of trade can be introduced only when the contract is ambiguous. And the Virginia commentators,[4] noting that "[t]his section reflects a more liberal approach to the introduction of parol evidence * * * than has been followed in Virginia," express the opinion that *Mathieson, supra,* and similar Virginia cases no longer should be followed. Va.Code Ann. § 8.2–202, Va.Comment. See also *Portsmouth Gas Co. v. Shebar,* 209 Va. 250, 253 n. 1, 163 S.E.2d 205, 208 n. 1 (1968) (dictum). We hold, therefore, that a finding of ambiguity is not necessary for the admission of extrinsic evidence about the usage of the trade and the parties' course of dealing. [See *Warrick, supra* ].

■■ We turn next to Royster's [Seller] claim that Columbia's [Buyer] evidence was properly excluded because it was inconsistent with the express terms of their agreement. There can be no doubt that the Uniform Commercial Code restates a well established rule that evidence of usage of trade and course of dealing should be excluded whenever it cannot be reasonably construed as consistent with the terms of the contract. *Division of Triple T Service, Inc. v. Mobil Oil Corp.,* 60 Misc.2d 720, 304 N.Y. S.2d 191, 203 (1969), *aff'd. mem.,* [34 A.D.2d 618] 311 N.Y.S.2d 961 (1970). Royster [Seller] argues that the evidence should be excluded as inconsistent because the contract contains detailed provisions regarding the base price, escalation, minimum tonnage, and delivery schedules. The argument is based on the premise that because a contract appears on its face to be complete, evidence of course of dealing and usage of trade should be excluded. We believe, however, that neither the language nor the policy of the Code supports such a broad exclusionary rule. Section 8.2–202 [5] expressly allows evidence of course of dealing or usage of trade to explain or supplement terms intended by the parties as a final expression of their agreement. When this section is read in light of Va.Code Ann. § 8.1–205(4),[6] it is clear that the test of admissibility is not whether the contract appears on its face to be complete in every detail, but whether the proffered evidence of course of dealing and trade usage reasonably can be construed as consistent with the express terms of the agreement.

*Id.* at 8.

■ The Court finds that the proffered evidence regarding course of dealing and trade usage, as it relates to shipping rates, is not inconsistent with the terms that appear in the contract. Indeed, the proffered evidence can reasonably be construed as consistent with the express terms of the agreement. The proffered evidence sought to establish that because of prior dealing and common knowledge in the trade that there were problems in maintaining adequate rail car service to the quarry. Furthermore, within this industry, it was common knowledge that labor strikes and inclement weather would have an influence on the ability to ship the stone. Such things are outside the ability of either party to control. Therefore, the Court finds that for these reasons Indiana Limestone shipped "Breakwater" stone at a reasonable rate.

In further support of the above holding, the Court adopts the guidelines that the *Columbia Nitrogen* court used to determine whether such proffered evidence could be used. Specifically, that Court noted the following:

[That] the contract [did] not expressly state that course of dealing and usage of

3. See I.C. 26–1–2–202.

4. See, Survey of Recent Development in Indiana Law VI. Contracts, Commercial Law, and Consumer Law (Gerald Bepko), 11 Ind.L.Rev. 100.

5. See I.C. 26–1–2–202.

6. See I.C. 26–1–2–205(4).

trade [could] not be used to explain or supplement the written contract.

[That] the contract [was] silent about adjusting price and quantities to reflect a declining market. It neither [permitted] nor [prohibited] adjustment, and this neutrality [provided] for a fitting occasion for recourse to usage of trade and prior dealing to supplement the contract and explain its terms.

*Id.* at 9.

In this case the contract did not expressly state that course of dealing and usage of trade could not be used to explain or supplement the written contract. The Court finds that the contract is silent about adjusting the shipping rate to reflect the adverse conditions, as presented, against a rigid shipping schedule. The contract, as formulated, neither permits nor prohibits adjustment, and the Court now finds this silence permits the application of usage of trade and prior dealing to supplement the contract and explain its terms.

It is a matter of some interest that Luedtke was successful in obtaining a $545,000.00 payment from the Corps of Engineers in settlement of a damage claim based upon the failure of delivery of stone to complete this harbor job as rapidly as Luedtke had planned. This Court is not basing its determination on the fact that Luedtke received this substantial payment based on the contention that they should have been able to obtain the stone elsewhere when Indiana Limestone failed or was unable to make the deliveries as rapidly as possible. As Indiana Limestone argues, Luedtke claimed the Corps of Engineers was liable for damages caused by Indiana Limestone's defective performance because Luedtke was prevented from going to other suppliers to secure the necessary stone. Examination of Luedtke's claim against the Corps of Engineers shows substantial overlap in Luedtke's request for damages as between the liability of the Corps of Engineers and the liability of Indiana Limestone. It is true that Luedtke did not receive as much as requested from the Corps of Engineers; however, Luedtke did

execute a complete release in order to receive the $545,000.00 payment.

In summary, the Court points out the following factors which it felt are significant in reaching the conclusion that Indiana Limestone never intended nor agreed to be bound by the terms of the purchase order which directed Indiana Limestone to ship at the rate of 1500 tons per day. This was clearly an impossible requirement within the context of all that was well known to both Luedtke and Indiana Limestone. Nowhere in the evidence has it appeared that Luedtke specifically informed Indiana Limestone that they planned on finishing this harbor project within a period of some 14 weeks when Luedtke's contract with the Corps of Engineers provided a completion date of some 14 months from mid-summer of 1978 to November of 1979.

Both parties were well aware that the "A" stone required for the project was a by-product of the regular stone quarry operation. The evidence indicates further that the parties were attempting to cooperate. For instance, Indiana Limestone had originally bid the job at approximately $10 per ton which price was cut to $5.50 per ton upon request from Luedtke. It is simple mathematics that for its performance, defendant realized only $385,000.00 in return for 70,000 tons of type "A" Breakwater Stone. This figure, of course, is exceedingly modest compared to Luedtke's current request for damages from Indiana Limestone.

Although it is disputed as to whether Luedtke ever received Indiana Limestone's acknowledgment form, which contained a force majeure clause, an escape clause, in the event of weather, strikes and unavailability of rail cars; it is undisputed that all of the foregoing problems plagued Indiana Limestone in their attempted performance of this agreement with Luedtke.

Certainly past experience and past dealing with Indiana Limestone would have made Luedtke well aware of the hazards of expecting prompt and regular delivery of stone in an amount anywhere near the specified 1500 tons per day.

Evidence was also introduced that at least some delay in shipments was occasioned by the cooperation of Indiana Limestone in attempting to secure a better freight rate from the L & N Railroad which serviced the Reed Quarries. Incidentally, the new rate by the L & N Railroad was not placed into effect until November 29, 1978. This was important to Luedtke since they were paying the freight rates from the loading point to the Milwaukee Harbor project.

The Court finds no need to discuss the manner in which Luedtke utilized its marine equipment and employees in completing the Milwaukee Harbor project. It is clear that Luedtke had other projects under way, some of which were with the Corps of Engineers. Even if the Court found in favor of Luedtke as to the Contractual arrangement, the Court would find it very difficult to assess damages for all alleged work cessation and wasted standby time of employees.

Luedtke was able to complete the Milwaukee Harbor Project within the time specified in their agreement with the Corps of Engineers. Delay by Indiana Limestone, therefore, did not place Luedtke in default on this project. It is of further interest to note that Luedtke's construction project chart submitted to the Corps of Engineers June 19, 1978 showed a job completion date of July 31, 1979.

The foregoing shall constitute the findings of fact and conclusions of law of this Court pursuant to Rule 52 of the Federal Rules of Civil Procedure.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the plaintiff take nothing by way of their complaint herein and that costs be borne accordingly.